WEBSTER LUMBER COMPANY, A CORPORATION EXISTING UNDER THE LAWS OF THE STATE OF FLORIDA, *Appellant,* v. MRS. JENNIE E. LINCOLN, A WIDOW, *Appellee.*

Opinion Filed December 13, 1927.

1098

*Murrell & O'Farrell,* for Appellant;

*Stapp, Vining & Ward,* for Appellee.

CAMPBELL, Circuit Judge:

This in an appeal from a decree of the court below, sustaining a demurrer to and dismissing a bill of complaint, wherein the appellant, as complainant, sought to have specific performance by the appellee, as respondent, of an alleged contract to sell and convey real estate.

The land in controversy is described, and the complainant's version of the alleged contract is set forth in the bill of complaint as follows:

"That the said Jennie E. Lincoln was, at the time the contract hereinafter referred to was made between complainant and defendant, and now is, the owner of the following described real estate, situate and lying in Dade County, State of Florida.

"Lot Three (3) of Block Three (3) according to Plat of

'Little River Gardens,' a subdivision of a portion of the Southeast Quarter (SE¼) of Section Seven (7), Township Fifty-three (53) South of Range Forty-two (42) East, as recorded in Plat Book 6 at page 44 of the Public Records of Dade County, Florida.

"Complainant further represents that on or about the . . . . . . . . . . day of June, 1924, said Webster Lumber Company, by its agent, M. P. Harvey, thereunto duly authorized, entered into a contract with the defendant, Jennie E. Lincoln, by the terms and provisions of which the said defendant, for the consideration hereinafter named, agreed to sell, and, by proper deed convey to complainant, the real estate above described, said deed to be executed and delivered by defendant to complainant, on or about the first day of October, 1924; and also agreed to deliver to complainant an abstract of the above described property, showing said property to be free of all liens; that as a consideration of the conveyance of said property to it, said complainant, in and by said contract agreed to pay to the said defendant, the sum of Forty-five Hundred ($4,500.00) Dollars. One Hundred ($100.00) Dollars thereof to be paid in cash, said payment to be given by said M. P. Harvey as agent for complainant to bind the bargain; Fourteen Hundred ($1400.00) Dollars at the time of the execution and delivery of the deed, and the balance of Three Thousand ($3,000.00) Dollars to be paid and secured by notes and a first mortgage on said real estate, payable in four equal installments, one note in the sum of $750.00 to be due in six months from the date and execution and delivery of the deed, one note in the sum of $750.00 in twelve months, one note for $750.00 in eighteen months and one note for $750.00 in twenty-four months from the date of said deed, each of said notes to bear interest at the rate of eight per cent per annum. It was further agreed in and by said contract that the defend-

ant was to retain possession and use of said house if she so desired, until April 1, 1925, without rent charges, and if said defendant should decided to retain the use of said house, complainant was not to pay any interest on the balance of the purchase price until such time as the property should be delivered to it by said defendant.''

It is then alleged in the bill of complaint that a memorandum of the said contract was made and signed by the parties, and consisted of correspondence between the complainant's agent, M. P. Harvey, and the respondent. This correspondence, consisting of several letters and other writings, is attached to and made a part of the bill of complaint as Exhibits ''A,'' ''B,'' ''C,'' ''D,'' ''E,'' and ''F,'' which are as follows:

### EXHIBIT ''A''

''April 28, 1924.

''Miss Jennie Lincoln,
 Sutton, Mass.

''Dear Miss Lincoln:

''I am writing you in regard to the house which you all have here in Little River; the one on East Mooney Avenue, and which you lived in while here.

''As you know, I presume, I have sold my lumber business here, and am now handling real estate—mostly my own, though I am handling some for others. I now have a customer on this place of yours.

''Simply as a matter of information to you and in order that you may the better understand the situation, I will advise you that this party who is interested in your place is not wanting it for a residence, but for business purposes. He has already secured a lot facing Everglade

Avenue next to Mrs. Cortright (which you remember is back and a little east of your place) ; in other words, it is the lot on Everglade Avenue north of the old lumber yard; he has also secured the two lots which was formerly used as a lumber yard, which you know is right next to your place on the east. He has also secured an option, and will in all probability buy, the house and lot owned by Mr. Dye—the old Rogers house, and has an offer on Mr. Wise's place, which he will very probably take. This will give him a place right down the railroad from Everglade Avenue more than five hundred feet in length, and two lots in width, except on Everglade, where he has as yet only secured one. He has another offered him on Everglade, but does not think he would need but one there; just enough for his office, and his business would lay back down the railroad. This man is now in the North, and I received a wire from him asking that I see you all and get a price on your place, and also see Mr. Sprowl and get a price on his place; he does not know positively that he will want for his business more than two lots wide, which would be the old lumber yard, and the Wise and Rogers places, but he will consider prices on your place and the Sprowl place. I will appreciate it, therefore, if you will advise me by first mail what price I may quote this place to him at— please let your price carry 5% commission to me.

"You have, no doubt, found it quite annoying to be so close to the railroad as you are here, and with a business going right in next door to you, where all kinds of trucks, etc., would be constantly filling the street in front of your door, as well as the continuous noise all day, and part of the night a great deal of the time, I really believe it would be to your interest to dispose of this place and buy further out from the railroad where living would be a bit more pleasant. As I have said, my customer is not sure that he

would care for your lot, but I believe with the right kind of a price on it, I can induce him to take same, and if he will take this lot, I think you will do well to let him have it while he is in the notion, for if he goes ahead and lays out his plans for his buildings, etc., just on the two lots in width, he would hardly be able to handle yours to any advantage at a later time, and it would hardly be suitable for any other business as his business would have others cut off from the railroad so that they would not have the advantage of a sidetrack. And with such a business as he is going to put in there, it certainly would be very undesirable for a home. You will understand, please, that I do not mean to say that the contemplated business is something of a questionable nature; it is absolutely all right, only a thing no one would care to live right side of.

"You all, I presume, have furniture in the house, and may be would not want this disturbed until you come back in the fall; if this be true, I am sure my customer would be willing to let the house remain just as it is as late as the first of September, or may be even later than that, if you cannot get back here by that time. You could sell, subject to your keeping the house several months, the length of time to be agreed upon between you and the purchaser. It may even be that he could arrange to let you occupy the house all of next season, and you could turn it over to him when you want to go back North next spring. The main thing is, if he buys, he will want to buy right away, so he will know exactly how to lay out his buildings. I am sure the purchaser would be willing to give you ample time to get here and secure another desirable place before moving your furniture.

"In your reply, I will be glad for you to name the terms on which you would like for the sale to be made, and as

suggested, please also name price that carries the usual 5% commission to me as agent.

"Frankly, I shall be very much pleased to make this sale for you—not merely for the commission to me—but because of the fact that I should regret for any one to be crowded in their home life, as you would be here with this business going in by you, and not be in position, or have a chance, to sell your place. Of course, if you have the chance, as I believe you now have, and simply do not want to sell, that changes the matter, and I would not think of trying to push the sale on you.

"Please let me have an immediate reply.

"Yours very truly,<br>"(Signed) M. P. HARVEY."

EXHIBIT "B"

"Sutton, Mass., May 3, 1924.

"Mr. M. P. Harvey,
 Little River, Fla.

"Dear Sir:

"Rec'd your letters this morning, stating you probably had a purchaser for our property on E. Mooney Ave.

"In reply would say we would sell for $5,000 (Five Thousand) Dollars.

"Now about the furniture we would have to make some arrangement with the purchaser as you suggested.

"If you find it necessary to wire us in regard to same, send wire to Millbury, Mass., or Worcester, Mass., care of Tyler Stockwell, Sutton.

"Mrs. Jennie E. Lincoln,<br>"Sutton, Mass, Route 1, Box 105."

EXHIBIT "C"

"June 18, 1924

"Mrs. Jennie E. Lincoln,
 Sutton, Mass.

"Dear Mrs. Lincoln:

"With further reference to your house and lot on East Mooney Avenue, near railroad:

"I took this matter up with my customer in the North, sometime ago, and he at that time did not appear to care for your place, and especially at the price you named. The matter did not appeal to him so much, as he did not think he would need this additional lot.

"The customer I had in mind is Mr. Webster—the Webster Lumber Co. who bought out my lumber yard here. Mr. Webster has been in the North since early spring, and has just returned for a few days, and I had a talk with him today, and went into this subject with him again, trying to show how that he could use your lot to good advantage—if not right away, it would come in well later, as the business grew.

"Mr. Webster has closed for the lot next to railroad facing Everglade Ave. He has also closed for the two lots between your place and the railroad, formerly used for lumber yard. Then he has closed for the Wiese and Dye places next to railroad on South Side of Mooney Ave.—in other words, the two places between the Sprowl home and the railroad. It is Mr. Webster's plan to move the lumber yard from its present location, on the Highway, to above lots.

"This will make your place quite uninviting for a home. The Sprowl's knowing of this have been to see me to get me to do all I can to get their place in on this deal, and Mr. Webster has instructed me to close for this also, which deal I presume will be closed tomorrow. At the same time

I talked your place to Mr. Webster, and he stated to me that if you would make your price $4500.00, for me to close for this also. This price, you understand to carry a 5% commission to me, as he would not pay this price then pay me the commission.

"Mr. Webster does not intend moving the lumber yard before the coming year, and he has agreed to let you keep the place, in the event you desire to sell, as late as, say April 1st, 1925. This would give you the use of the house all through next season, and you would not have to move your furniture until you get ready to go back the coming spring. Mr. Webster will take the property at $4500.00 on terms of one-third cash balance one and two years, equal payments, deferred payments to bear interest at 8%.

"In view of the fact that you cannot turn property over to Mr. Webster, until you return in the fall, and will probably want to use house next season, I would suggest that a good way to handle same would be for us to give you a check for small amount, say $100.00 to show good faith, and to act as a binder, balance of full cash payment to be made, and notes given for deferred payments, on date you are ready to turn house over to Mr. Webster, provided you are in position to deliver to him abstract, with clear title to said property. This, of course, with the understanding that property is to be turned over to him not later than April 1, 1925.

"Mr. Webster, is leaving in a few days, within a week, for the North again, to be gone balance of the summer; I, also am leaving in about ten days for the mountains, for a couple of months. I think it advisable to close this while Mr. Webster is here, and while he is agreeable to taking the property, and for this reason I am attaching my check for $100.00 as a binder on the deal; also am attaching a receipt for you to sign and return to me, in event you accept the

proposition as outlined. I would also ask that you wire me immediately on receipt of this letter, if you are accepting the offer, so I may get the deal closed up before we both get away for the summer.

"In event that there are some slight changes you would like to make, which would meet your requirements better than those outlined, you might suggest the changes, and it may be agreeable with Mr. Webster; it may be that you would rather have the deferred payments made in quarterly payments rather than annual, or some other change that might not matter so much to us, and would suit you better.

"If you owe a balance on the property, we would be glad to arrange our payments so as to enable you to take care of yours.

"Please let me have an immediate reply, so I may get this closed while we are all here.

"Yours very truly,

(Signed) "M. P. Harvey.

"Be sure to have two witnesses to agreement enclosed; also be sure to have Notary state when his commission expires; this is absolutely necessary in Florida."

EXHIBIT "D"

"Received of M. P. Harvey one hundred dollars ($100.00) as initial payment on the following described property:

Lot Three (3) of Block Three (3) according to the Plat of Little River Gardens, a subdivision of a portion of the S. E. 1-4 of Section Seven, Township Fifty-three South, Range Forty-two East, as recorded in Plat Book 6, page 44, public records of Dade County, Florida.

"I agree to deliver to said M. P. Harvey, or his assigns, abstract, with deed free of all liens, covering above described property, at which time said M. P. Harvey, or his assigns, is to pay me Fourteen Hundred dollars ($1400.00)

in addition to the one hundred dollars ($100.00) already paid, as above; and is to give me two notes for Fifteen hundred dollars ($1500.00) each, both bearing interest from date given at 8% per annum; making total payment for property described above forty-five hundred dollars ($4500.00).

"It is understood and agreed that I am to pay M. P. Harvey a commission of 5% on total amount of sale, viz. $4500.00, said commission to be paid at time of closing of deal as above outlined. Total amount of commission to be paid $225.00.

"It is understood and agreed that transfer is not to be made before Oct. 1, 1924, and if I should desire to retain use of house during the next winter season, I may do so, and deliver same to M. P. Harvey, or his assigns, on or about April 1, 1925.

"It is understood and agreed that should I desire to use said property until April 1, 1925, that I am to do so without rent charges, and if I should have use of the house until that time that said M. P. Harvey is not to pay any interest on balance of purchase price, until such time as property is delivered to him, or his assigns.

"It is understood and agreed that I am to remove all furniture from house located on above described lot, but that all improvements on said lot are included in sale as above outlined.

"Signed, sealed and delivered ....................
in presence of:

...............................
...............................

"Subscribed and sworn to before me this........day of ...................., 1924.

"................N. P.

"My commission expires........"

## EXHIBIT "E"

"Sutton, Mass. June 24, 1924

"Mr. M. P. Harvey,
 Little River, Fla.

"Dear Sir:

"Your letter just received.

"With reference to our house and lot on East Mooney Ave., near railroad, will say price will be satisfactory ($4,500.00).

"But we would want a mortgage on the property, as we do not care to take notes; would rather have the deferred payments made in quarterly or semi-annual payments, rather than annual.

"But would prefer cash rather than take a mortgage.

"We do not owe any balance on the property, so could give you abstract with deed free of all liens, when the $4,500.00 is payed in full.

"The rest of the agreement is satisfactory, as we would want to live in the house the coming season.

"Will hold your one hundred-dollar check ($100.00) until we hear from you again, to know what we are to do.

 "Yours very truly,
(Signed) "MRS. JENNIE E. LINCOLN."

## EXHIBIT "F."

"June 28, 1924.

"Mrs. Jennie Lincoln,
 Sutton, Mass.

"Dear Mrs. Lincoln:

"Your letter of the 24th is before me, in which you accept offer for your property here, but asking for certain

changes in the agreement. In reply, it will be agreeable to change deferred payments to semi-annual payments, as per your suggestion.

"Regarding your statement that you prefer mortgage to notes. It was my intention, in the proposition submitted to you, that we should give you a mortgage. In other words, the manner of handling would be: you give deed to property, purchaser to give you back a first mortgage covering the same property you are selling, with notes attached to the mortgage. One note would fall due in six months from date of transfer of property, one in twelve months, one in eighteen months, and the other in twenty-four months, the mortgage to be cancelled by you upon payment of last note.

"By the way, it will be necessary for us to have abstract brought down to date so we may know, or have, our attorney pass upon title before we would know whether the title is clear or not. I can borrow an abstract from Mr. Mooney covering the property up to two or three years ago, and have it brought up from that date; it won't cost very much, and it is necessary and also customary to have this done. I presume it will be agreeable to you to pay this small charge, and ask that you advise me as to this. It is, of course, customary for seller to stand this charge.

"You may attach this letter to your copy of agreement, using it as part of same, covering the suggested changes.

"Yours truly,

(Signed) "M. P. HARVEY."

It is further alleged in the bill of complaint that the complainant was, at the time of entering into the alleged contract and had ever since been, ready, able and willing to carry out the contract upon its part; but that the respondent had failed and refused to perform the contract upon her part, although requested to do so by the complainant.

There are several grounds set up in the demurrer to the bill of complaint, the effect of all being: First, to question the sufficiency of the allegations of the bill of complaint, including the exhibits attached, to show a binding and subsisting contract, upon the part of the respondent, to sell the lands described therein to the complainant; and second, to question the sufficiency of the allegations of the bill of complaint to show a contract, binding upon the real estate, to support an action for specific performance.

At the hearing on this demurrer, the chancellor made an order or decree which, excluding the preliminary and concluding statements, is as follows:

"It is Ordered, Adjudged and Decreed that the said demurrer of the defendant be and the same is hereby sustained; and it appearing to the court that the exhibits attached to complainant's bill of complaint do not show a valid subsisting contract between the parties for the sale of said property,

"It is therefore, further Ordered, Adjudged and Decreed that complainant's bill of complaint be and the same is hereby dismissed at cost of complaintant."

The only error assigned here is the rendition of the above decree by the court below.

It will be seen from the wording of the decree, that the demurrer to the bill of complaint was sustained and the bill dismissed, upon the theory that the exhibits, which were attached to and made parts of the same, as constituting the contract between the parties, did not show a valid, subsisting contract between the parties for the sale of the property.

As we view it, the case may be determined in this Court by the answer to the following question: "Do the allegations of the bill of complaint, and the exhibits thereto attached and made parts thereof, set forth a valid, subsist-

ing contract between the complainant and the respondent, for the purchase by the complainant and the sale by the respondent of the land described therein?''

The portion of the bill of complaint quoted above gives the complainant's contention as to the terms and meaning of the alleged contract entered into by the parties, through the correspondence attached to the bill as exhibits. If the correspondence relied upon and made parts of the bill reveal such a meeting of the minds, as contended for by the complainant in its interpretation thereof as quoted above, then the allegations of the bill and its exhibits, as a whole, would show a valid, subsisting contract.

This Court has held that a complete contract may be gathered from letters, writings and telegrams, between the parties relating to the subject matter of the contract, and so connected with each other that they may be fairly said to constitute one paper. Meek v. Briggs et al., 80 Fla. 487, 86 South. Rep. 271; Tucker v. Gray, 82 Fla. 351, 90 South. Rep. 158; Gautier v. Bradway, 87 Fla. 193, 99 South. Rep. 879; Simons v. Tobin, 89 Fla. 321, 104 South. Rep. 583.

We must look to the correspondence, which it is alleged in the bill contains the contract, to determine whether or not there was a binding contract between the complainant and the respondent for the purchase and sale of the land described.

The appellee contends that the correspondence does not give a sufficient description of the land, which complainant claims was agreed to be sold, and that for this reason the decree of the court below was proper. As to this contention, we are of the opinion that the general description contained in the letters shows a particular tract, as distinguished from others in the minds of the parties, in these negotiations, and under our holding in the case of Lente v. Clark, 22 Fla. 515, 1 South. Rep. 149, and Simons v. Tobin,

*supra,* the description in the correspondence was sufficient. We shall, therefore, undertake to determine whether the correspondence shows a contract, or does it reveal only negotiations between the parties, for the sale of the property therein referred to, by the respondent to the complainant.

In order that there be a contract, the parties must have a definite and distinct intention, common to both, and without doubt or difference. Until all understand alike, there can be no assent, and therefore no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. 13 C. J., pp. 263-264; Strong etc. Co. v. Baars, 60 Fla. 253, 54 South. Rep. 92; Ross v. Savage, 66 Fla. 106, 63 South. Rep. 118.

In the case of Strong etc. Co. v. Baars, *supra,* we said: "In order to create a contract it is essential that there should be a reciprocal assent to a certain and definite proposition, and so long as any essential matters are left open for further consideration, the contract is not complete, and the minds of the parties must assent to the same thing at the same time."

"The preliminary negotiations leading up to the execution of a contract must be distinguished from the contract itself. There is no meeting of the minds of the parties while they are merely negotiating as to the terms of an agreement to be entered into. To be final, the agreement must extend to all the terms which the parties intend to introduce," etc. 13 C. J., p. 289, par. 100; Ocala Cooperage Co. v. Florida Cooperage Co., 59 Fla. 390, 52 South. Rep. 13.

The first letter that passed relative to the proposed purchase of the property, was one written by M. P. Harvey, therein representing himself to be a real estate man. In it

he tells the respondent that he is writing "in regard to the house which you all have here in Little River; the one on East Mooney Avenue, and which you lived in while here." In this letter he advises the respondent that he can probably sell this property to a party whose name he did not mention, and asks the respondent to name a price on the property and her terms, if she would sell, asking also that the price named include 5% commission for him. This letter was merely a letter of inquiry—the beginning of the negotiations for the purchase of the property.

On May 3, 1924, Mrs. Lincoln, the respondent, replied to the letter of Harvey, quoting him a price of $5,000.00 for the place. She said nothing of terms, and therefore it is presumed that she intended it to be a cash transaction. This letter was an offer upon her part to sell for $5,000.00 cash.

On June 18, 1924, Harvey wrote Mrs. Lincoln, in which he advised her that the party he had in mind for the purchase of the property was "Mr. Webster—the Webster Lumber Co." After advising her in this letter that his purchaser, Webster Lumber Co., did not appear to be interested in the purchase of the property at the price quoted by her in her letter of May 3, 1924, and going considerably into detail as to reasons why a sale of the property to this party would be to her advantage, he advises her that he is authorized by Webster Lumber Co. to offer for the property $4,500.00, "one-third cash, balance in one and two years, equal payments, deferred payments to bear interest at 8%,"—The price to include his commission of 5%. He then undertook in the letter to detail a plan by which the respondent might occupy the house until not later than April 1, 1925, and enclosed his personal check for $100.00, which he said was "to show good faith, and act as a binder, balance of full cash payment to be made and notes given

for deferred payments on date you are ready to turn over house to Mr. Webster, provided you are in position to deliver to him abstract with clear title to said property.''

In this letter, it appears that he also enclosed a form of receipt for the $100.00, which contained the proposition outlined by him, asking respondent, if the offer was accepted, to sign the receipt and return to him; also requesting that she wire him immediately, if she accepted the offer. The form of receipt is set forth as Exhibit ''C'' to the bill of complaint.

The letter declined the offer of Mrs. Lincoln to sell for $5,000.00 cash, and contains a counter-offer, or proposition. On June 24, 1924, Mrs. Lincoln replies to this letter and the offer therein contained as follows: ''Your letter just received, with reference to our house and lot on East Mooney Ave. near railroad. Will say price will be satisfactory ($4,500.00). But we would want a mortgage on the property, as we do not care to take notes, would rather have the deferred payments made in quarterly or semi-annual payments rather than annual. But prefer cash rather than take mortgage. We do not owe any balance on the property, so could give you abstract with deed free of all liens, when the $4,500.00 is payed in full. The rest of the agreement is satisfactory as we would want to live in the house the coming season. Will hold your one hundred dollar check ($100.00) until we hear from you again to know what we are to do.''

In a letter from M. P. Harvey to Mrs. Lincoln, dated June 28, 1924, he says in part: ''Your letter of the 24th is before me, in which you accept offer for your property here, asking for certain changes in the agreement.'' He then says it will be agreeable to change the deferred payments from annual to semi-annual payments ''as per your suggestion.'' He further said that it was the intention to

give a mortgage to secure the deferred payments. Refers also to the necessity of having abstract of the property brought down to date, and that he presumed she would do this at her cost.

Mrs. Lincoln made no reply to this letter.

Was the letter written by Mrs. Lincoln on June 24, 1924, an acceptance of the offer made her by complainant's agent in his letter of June 18, 1924? We think not.

She said in that letter: "Will say the *price* will be satisfactory ($4500.00)." But she declined to accept the terms of payment, declined to accept notes for deferred payments, stating she would want the deferred payments in semi-annual or quarterly installments rather than annual, but preferred the cash instead of deferred payments secured by mortgage. The only terms of complainant's proffer which were acceptable to her were those which fixed the price and provided for her occupancy of the property during the winter season of 1924-1925, if the agreement for sale was perfected. She also in her letter said that she could deliver abstract of title with deed clear of lien *"when the $4500.00 is paid in full."* (Italics supplied) And also stated that she would hold the $100.00 check until she heard from the agent again *"to know what we are to do."* (italics supplied)

This letter of the respondent appears to indicate that she wanted payment in cash, and that she did not expect or intend to furnish an abstract or execute and deliver a deed until the $4500.00 "was payed in full." As we have said, she never, as far as it appears from the record, assented to the proposals for changes in the agreement made by complainant's agent in his letter of June 28. 1927.

An acceptance of an offer, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing, and another accepts condi-

tionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat or it is a counter proposal, and in neither case is there an agreement or contract. 13 C. J. p. 281, par. 86; Strong etc. Co. v. Baars, *supra*.

"Under the rules applicable to offer and acceptance generally, a contract by correspondence is not complete until the communications have passed beyond the state of preliminary negotiations. The minds of the parties must have met, and it must appear that at some point in the correspondence there was a definite proposal by one party which was unconditionally accepted by the other." 13 C. J. p. 299, par. 114.

The correspondence relied upon by the complainant to constitute a contract for the sale to it of the property described, by the respondent, does not, in our opinion, show such a meeting of the minds of the parties as would make a valid, enforcible contract upon the part of the respondent to convey the property to the complaint. There does not appear to have been a point reached in the correspondence where there was a definite proposal made by one of the parties which was unconditionally accepted by the other.

"Where the parties are merely negotiating as to terms of an agreement to be entered into between them, there is no meeting of the minds, and consequently no contract while the agreement is incomplete." Ocala Cooperage Co. v. Florida Cooperage Co., *supra*.

"The offerer has the right to prescribe in his offer any conditions as to time, place, quantity, mode of acceptance, or other matters which it may please him to insert in and make a part thereof, and the acceptance, to conclude the agreement, must in every respect meet and correspond with the offer, neither falling short of or going beyond the terms proposed, but exactly meeting them at all points

and closing with them just as they stand." 13 C. J. p. 279, par. 82; Strong etc. Co. v. Baars, *supra*.

According to the allegations of the bill of complaint, the $100.00 check was, in November, 1924, returned by the respondent to the agent of the complainant, and was apparently accepted and retained by him; and some days later the complainant recognized, or acknowledged its return and acceptance by it, when it tendered, as it alleges in the bill, $1500.00 to the respondent as the cash payment on the property.

The court below did not err in its decree sustaining the demurrer to and dismissing the bill of complaint. The decree is, therefore, affirmed.

Affirmed.

PER CURIAM.—The record in this cause having been considered by this Court, and the foregoing opinion, prepared under Chapter 7837, Acts of 1919, adopted by the Court as its opinion, it is considered, ordered and decreed by the Court that the decree of the Circuit Court in this cause be, and the same is hereby affirmed.

ELLIS, C. J., AND WHITFIELD, TERRELL, BROWN AND BUFORD, J. J. concur.

STRUM, J., dissents.

STRUM, J., (dissenting) :

In my opinion the allegations of the bill of complaint disclose an enforcible contract.

In defendant's letter of June 24, 1924, she accepts the purchase price of $4500.00 theretofore offered by the complainant, but prescribes a different scale of maturities

for the deferred payments and requires a mortgage to secure them. It is true she says in that letter that she "would prefer cash rather than take a mortgage," but that is a mere statement of her "preference,"—an alternative. She also states in that letter that "we do not owe any balance on the property, so *could* give you abstract with deed free of all liens, when the $4500.00 is payed in full." The phrase last quoted, in my opinion, does not purport to be a requirement that the complainant pay all cash in any event, and that otherwise there would be no sale. The letter does not say that the defendant *"will* give the complainant a deed *only* when $4500.00 is paid in full." On the contrary, the last quoted phrase appears chronologically immediately after defendant's statement that she would "prefer" cash rather than take a mortgage, and when she immediately followed that by saying that she *"could* give a deed free of all liens when the $4500.00 is payed in full," she meant only that in the event the complainant elected to pay cash she could deliver good title without incumbrances. The latter proposition was no limitation on her previously stated alternative to accept notes secured by a mortgage, provided the notes matured quarterly or semi-annually, instead of annully. Defendant's letter of June 24, 1924, is an acceptance of complainants previous offer in all respects, except as to the terms of payment. In that respect the letter is a new offer from the defendant to the complainant. It is tantamount to an offer on her part to sell for $4500.00 on either plan of payment therein stated. In the letter of June 28, 1924, complainant, by its agent, accepted that offer, and adopted one of the two methods of payment offered by the defendant.

In her letter of June 24, 1924, defendant says she will hold complainant's deposit of $100.00 "until we hear from

you again, to know what we are to do.'' To me, this means until the defendant heard whether complainant will pay all cash, or part cash with deferred payments maturing and secured as defendant prescribed in her letter of June 24, 1924. This information was promptly given her in complainant's letter of June 28, 1924, in the form of an acceptance of her terms, and while she still retained the consideration represented by the $100.00 check which she made no objection to receiving in lieu of cash, after which the defendant retained the deposit check for at least four months, until November, 1924.

In my opinion, there was a meeting of the minds, a sufficient consideration, and a sufficient compliance with the Statute of Frauds.

The total purchase price was agreed upon, as well as the portion to be paid in cash, and the dates of maturity of the notes representing the deferred payments. From that situation, equality in the amounts of the deferred payments is presumed.

See Conroy v. Woodcock, 53 Fla. 582, 43 South. Rep. 693.

I therefore dissent.