G. H. CRADDOCK, d/b/a Southern Heat Pump Company, Plaintiff-Appellant,

v.

GREENHUT CONSTRUCTION COMPANY, Inc., Defendant-Appellee.

No. 27782.

United States Court of Appeals,
Fifth Circuit.

March 9, 1970.

Alan H. Rosenbloum, Pensacola, Fla., Thomas F. Johnston, Memphis, Tenn., for appellant.

Gordon W. Wells, Gerald L. Brown, E. N. Stephens, Jr., Pensacola, Fla., for appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

Appellant, G. H. Craddock, d/b/a Southern Heat Pump Company, brought an action in the United States District Court for the Northern District of Florida against appellee, Greenhut Construction Company, Inc., for breach of contract to employ Craddock as a subcon-

tractor on a construction project.[1] This appeal is taken from an order of the district court granting Greenhut's motion for summary judgment. We reverse.

The controversy arises from Craddock's thwarted efforts to obtain the subcontract for the heating and air-conditioning of 300 housing units to be constructed at Eglin Air Force Base, Pensacola, Florida. Craddock is a mechanical contractor. For the five years immediately prior to the critical events, he was primarily engaged in construction work in the Panama Canal Zone. While between jobs in Panama, Craddock came to the States in search of work. He met Dudley Greenhut, appellee's president, in Charleston, South Carolina, where both had come to bid on another government project. There they discussed Greenhut's plan to submit a bid for the general contract for the forthcoming Eglin project, and it was agreed that Craddock would furnish Greenhut with a bid for the heating and air-conditioning portion of the work.

On 21 June 1967, Craddock sent Greenhut a bid of $322,500.00 not including the cost of a payment and performance bond. A second bid letter dated 17 July 1967 quoted the lump sum of $328,000.00 including the cost of acquiring the bond. Greenhut used Craddock's June 21 bid plus the normal cost of a bond in preparing its bid on the general contract. On 20 July 1967, Craddock sought and obtained a letter from Greenhut which provided in part:

> We wish to advise, at this time, that in the event that we are awarded the above subject contract, that we will award you a contract covering Section 28, HEATING AND AIR CONDITIONING, as outlined in your letter of June 21, 1967, providing that we are furnished with a Performance Bond two (2) weeks thereafter. This bond must be furnished with good and sufficient surety or securities accept-

able to the General Contractor and the Government.

On 8 August 1967, Greenhut was awarded the general contract for the Eglin project. It informed Craddock, by means of a letter from its president dated 12 August 1967, that unless it received the performance bond by 17 August 1967 it would "of necessity consider the matter closed." Craddock received this letter on 15 August 1967, and replied by a letter bearing that date. Craddock referred to the Greenhut letter of 20 July 1967, and reaffirmed his intention to comply with its terms. In reference to the letter of 12 August, he stated that he would do his best to expedite the bonding procedure. On 15 August 1967, Greenhut sent Craddock a telegram noting that it had been requested by the government to furnish the name of the mechanical subcontractor and stating:

> Due to your inability to furnish a performance and payment bond, which we have requested from you several times, we deem it necessary to consider another source for the project.

The bonding company that Craddock had previously used was not licensed to issue bonds in the United States. Consequently, Craddock had been negotiating with Fidelity & Deposit Company of Maryland for the payment and performance bond. On 16 August 1967, an agent of this company called Dudley Greenhut and informed him that Fidelity & Deposit was prepared to issue a bond for Craddock. Greenhut stated that it would be unnecessary to furnish the bond, since Greenhut was obtaining another subcontractor for the project.

Craddock, through his counsel, sought a clarification of the situation by a letter of 22 August 1967. Greenhut received the letter but made no response. Subsequently, Craddock filed suit alleging breach of contract. Greenhut denied the existence of a contract and counterclaimed for the additional cost of the

1. Jurisdiction was based on diverse citizenship under 28 U.S.C. § 1332, requiring the district court to apply Florida law.

subcontractor who replaced Craddock.[2] Both parties filed motions for summary judgment.

The court determined that Greenhut's letter of 20 July 1967 was a rejection of the offers embodied in Craddock's bid letters, and a counteroffer to Craddock. This counteroffer was found to call for acceptance by the act of furnishing an acceptable performance bond. The manifestations by Craddock of his intention to furnish the bond were held insufficient to form a contract since the terms of the offer required the act itself. By the court's reasoning, Greenhut was free to withdraw its offer, and did withdraw it prior to effective acceptance.

Craddock contends that the court erred in classifying the parties' dealings as an abortive unilateral contract. Quite to the contrary, he argues that the circumstances clearly reveal a bilateral agreement to which the obtaining of a performance bond was a condition subsequent.

In determining that Greenhut's offer contemplated a unilateral contract, the district court cited Ballou v. Campbell,[3] as announcing rules which were dispositive. In *Ballou*, the plaintiff alleged that a shareholder of a failing corporation had promised to give all his capital stock to the plaintiff if he would take over management of the corporation and make it financially successful. Plaintiff allegedly accomplished the corporate rejuvenation and sued the estate of the since-deceased shareholder for specific performance. Faced with a classic unilateral contract, the court was primarily concerned with questions of consideration and mutuality. While *Ballou* is relevant for its citation of the definition of "unilateral" and "bilateral" contracts found in the Restatement of Contracts,[4] it is of little help in resolving the precise issue of the present case.

The parties are in agreement that the district court properly determined Greenhut's 20 July 1967 letter to be a rejection of the offer in Craddock's bid letters. The wisdom of this concession is borne out by the Florida cases requiring strict conformity to an offer to accomplish an effective acceptance.[5] There is also agreement that the Greenhut letter constituted a counteroffer to Craddock. The controversy centers on the interpretation of this counteroffer. The precise issue is whether the phrase, "providing that we are furnished with a Performance Bond two (2) weeks thereafter," constituted the exclusive means for accepting the offer, or expressed a condition subsequent modifying Greenhut's obligation to award the subcontract.

We deem neither interpretation of the phrase to be patently required by the language of the letter. Its wording lies somewhere between the clearest expression of either intention. In this situation, we consider the application of two canons of construction appropriate. § 31 of the Restatement of Contracts provides:

> In case of doubt it is presumed that an offer invites the formation of a bilateral contract by an acceptance amounting in effect to a promise by the offeree to perform what the offer requests, rather than the formation of one or more unilateral contracts by

---

2. Greenhut did not prosecute this counterclaim in the district court or on appeal, and the judgment of the district court did not treat it. We observe that the claim is apparently inconsistent with Greenhut's contention that no contract was formed.

3. 179 So.2d 228 (Fla.Dist.Ct.App.1965).

4. A unilateral contract is one in which no promisor receives a promise as consideration for his promise. A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee. Restatement of Contracts, § 12.

5. Bullock v. Harwick, 158 Fla. 834, 30 So.2d 539 (1947); Webster Lumber Co. v. Lincoln, 94 Fla. 1097, 115 So. 498 (1927); Strong & Trowbridge Co. v. H. Baars & Co., 60 Fla. 253, 54 So. 92 (1911).

actual performance on the part of the offeree.[6]

The expression of a similar position by one commentator explains the policy behind the presumption:

> Whenever possible * * * a court would and should interpret an offer as contemplating a bilateral rather than a unilateral contract, since in a bilateral contract both parties are protected from a period prior to the beginning of performance on either side.[7]

A second guidepost for resolution of such a doubtful situation requires that unclear language be resolved against the draftsman or the party for whose benefit the term is inserted.[8] The letter of 20 July 1967 was composed and given by Greenhut, and the bonding provisions were inserted exclusively for its benefit. It had the power and the ability to clearly require that its offer must be accepted by the act of furnishing the bond. These considerations lead us to conclude that the critical phrase was a condition subsequent which would limit Greenhut's obligations under the contract, and that the district court erred in interpreting it as defining the exclusive means of accepting the counteroffer.

Under our construction of the counteroffer, acceptance would entitle Craddock to the subcontract in the event Greenhut received the general contract. In return Craddock would be bound to the price quoted in its bid. Greenhut is still assured of receiving a bond, since the unexcused failure of Craddock to satisfy the condition would terminate Greenhut's contractual obligations. Greenhut has not contended that Craddock failed to manifest assent to its counteroffer, but adhering to its unilateral theory, has contended that these manifestations were legally insufficient. Craddock's acceptance is documented in his letter of 15 August 1967.[9]

Having decided that a bilateral contract was contemplated and formed, it remains to be determined whether Craddock's failure to satisfy the condition of furnishing a performance bond relieves Greenhut of its obligation to award the subcontract to Craddock. § 306 of the Restatement of Contracts states in part:

> Where failure of a party to a contract to perform a condition or a promise is induced by a manifestation to him by the other party that he cannot or will not substantially perform his own promise * * * the duty of such other party becomes independent of performance of the condition or promise.[10]

Greenhut's letter of 20 July 1967 required that the performance bond be furnished within two weeks of the award of the general contract.[11] The general contract was awarded on 8 August 1967, making the bond due by 22 August 1967.

■ Greenhut's letter of 12 August 1967 demanded receipt of the bond by 17 August 1967. Its telegram sent on

---

6. Restatement of Contracts, § 31.

7. 1 S. Williston, Contracts § 60, at 186 (3d ed. 1957). To the same effect see 3A A. Corbin, Contracts § 635 (1950).

8. Numerous Florida cases have espoused this principle. E. g., Travelers Indemnity Co. v. Washington Fed. Sav. & Loan Assn. of Miami Beach, 214 So.2d 492 (Fla.Dist.Ct.App.1968), and the cases cited therein.

9. This letter states in part:
   Reference is made to your letter of 20 July 1967, wherein you state that if you are awarded the above subject contract that you will in turn award Southern Heat Pump Company a contract covering Section 28C, Heating and Air Conditioning, as outlined in my letter of 21 June 1967, provided you are furnished with a performance and payment bond two (2) weeks thereafter.
   It is my intention to fully comply with this request.

10. Restatement of Contracts, § 306. *See, generally* 4 A. Corbin, Contracts § 977 (1950); 5 S. Williston, Contracts § 699 (3d ed. 1957).

11. Greenhut's contention that the time period, for furnishing the performance bond, is to be reckoned from the date of the letter is not persuasive since it is contrary to any reasonable interpretation of the letter.

15 August 1967 stated that it was considering "another source for the project." On 16 August 1967, with the possibility of furnishing the bond by Greenhut's accelerated deadline remaining, Dudley Greenhut told the agent of Fidelity & Deposit that it was unnecessary to furnish the bond for Craddock because Greenhut was obtaining another subcontractor for the project. Greenhut made no response to the 22 August 1967 letter from Craddock's counsel seeking a clarification of its position. Dudley Greenhut testified that his conduct was an effort to "put the club" to Craddock and speed up the bonding process, and that he would have been willing to take him back as mechanical subcontractor at any time before actual work began in September of 1967.[12] Regardless of subjective attitude, we feel Craddock could reasonably assume from Greenhut's arbitrary conduct, that he had lost the subcontract and that the furnishing of the performance bond was a useless gesture.

On the present state of the record, there is a reasonable basis to order that judgment be rendered for Craddock. However, in view of the original summary disposition of the case, and the posture in which it is presented to this court,[13] we remand it for the district court to determine whether there are additional facts which the parties can develop that would lead to a different conclusion. The judgment of the district court is reversed and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

---

12. The deposition of Dudley Greenhut contains the following:
   A. I can't speak for Mr. Craddock. I think you have had people that found you were probably a little slow in getting something up and used a club if proper to get it, to put you in a corner to try and force you to do something faster, is that not true, sir?
   *   *   *   *   *
   Q. But still in all the answer you just gave me, if Mr. Craddock had walked in with the bond on August 30th or September 1st, August 30th, you would have substituted his name for someone else's name and gone on with the job because of his low price, is that correct?
   A. Very definitely, sir.

13. Craddock seeks the following relief:
   (1) The Judgment rendered by the District Court sustaining defendant's Motion for Summary Judgment and the dismissing with prejudice and costs the Complaint of the plaintiff be reversed and this case can be remanded to the District Court for a hearing on its merits.