833 F.2d 1455
 Bankr. L. Rep. P 72,140
In the Matter of T & B GENERAL CONTRACTING, INC., Debtor.
PORT CHARLOTTE BANK AND TRUST COMPANY, a Florida banking
corporation, Plaintiff-Appellant,
v.
BALLENGER CORPORATION, A South Carolina corporation,
Defendant-Appellee.
 No. 86-3797.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 14, 1987.
 
 Roberta Colton, William Knight Zewadski, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for plaintiff-appellant.
 Roy W. Cohn, Tampa, Fla., Eugene Brantley, Brantley, Jackson & Peace, P.A., Columbia, S.C., for defendant-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HAND,* Chief District Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this bankruptcy appeal, we determine that neither the relationship nor events which occurred between a general contractor, a subcontractor, and a bank established a contract or duty which rendered the prime contractor liable or otherwise responsible for losses suffered by the bank when the subcontractor defaulted on its bank loans. We affirm.
 
 FACTS
 
 2
 This controversy between the appellant, Port Charlotte Bank and Trust Company (Bank) and Ballenger Corporation (Ballenger) began as an adversary proceeding in the United States Bankruptcy Court by the debtor, T & B General Contracting, Inc. (T & B), against the Bank, Ballenger, and another creditor. T & B, however, is no longer involved in this case.
 
 
 3
 Ballenger is a South Carolina corporation and was, during the time relevant to this lawsuit, a general contractor engaged in highway construction projects. Early in 1977, Ballenger entered into a contract with the Department of Transportation of the State of Florida (DOT) and became the general contractor on a highway project, known as Interstate 275, with segments located in the Florida counties of Sarasota, Lee, and Charlotte. After acquiring these contracts with DOT, Ballenger entered into four subcontracts with T & B, the debtor in the underlying bankruptcy action. Pursuant to these four subcontracts, T & B was obligated to complete certain work in four different phases of the Interstate 275 project.
 
 
 4
 The contract between Ballenger and DOT provided that Ballenger would submit monthly estimate reports to the DOT for construction completed during the previous month. After verifying the estimates, DOT would remit periodic payments to Ballenger for work performed during the subject month. Ballenger would in turn pay T & B for the portion of the work T & B had performed.
 
 
 5
 From the inception of this contractual arrangement, T & B maintained a banking relationship with the Port Charlotte Bank as both a depositor and a borrower. During the relevant time, it had both a general corporate account and a payroll account with the Bank; it was also indebted to the Bank on several loans, both secured and unsecured, made in connection with the highway projects.
 
 
 6
 During the course of the interstate construction and while T & B was indebted to the Bank, T & B's financial condition began to deteriorate, and its cash flow problems increased, seriously jeopardizing its ability to repay its loans to the Bank.
 
 
 7
 In September, 1978, the Bank agreed to renew its loans to T & B and continued to extend credit to T & B based on the monthly estimates for completed work Ballenger submitted to the DOT. During this time, Ballenger cooperated with the Bank and with T & B by informing the Bank of the amount of the progress payment earned by T & B each month. According to this informal arrangement, Ballenger would receive a payment from the DOT and remit the amount T & B had earned by issuing a check to T & B and the Bank as joint payees. T & B would endorse the check and deposit it with the Bank, whereupon the Bank would apply the funds to the accrued interest on T & B's loans. Thus, the parties agree that the Bank was repeatedly renewing the loans to T & B for successive thirty-day periods. It appears that on at least one occasion, the Bank reduced a portion of T & B's principal indebtedness and renewed the remaining indebtedness.
 
 
 8
 In this manner, the Bank had extended credit to T & B beginning in September, 1978, and continuing through January, 1979. By February, 1979, however, it became increasingly apparent that T & B was in a very difficult financial position. It appeared unlikely that T & B would be able to complete performance on the four subcontracts.
 
 
 9
 In March, 1979, W.W. Williams Company, a judgment creditor of T & B, garnished T & B's checking accounts. Contemporaneously, T & B's workers' compensation and liability insurance was cancelled. In light of these developments, Ballenger informed T & B that it considered T & B to be in default under their contract, and notified T & B that the four interstate subcontracts were terminated.
 
 
 10
 On March 22, 1979, T & B filed a voluntary petition pursuant to Chapter XI of the Bankruptcy Act of 1898. Based on the alleged default on the interstate subcontracts, Ballenger filed an unsecured claim in the amount of $709,387.35. On June 10, 1981, the bankruptcy court approved this claim. The Bank then liquidated its collateral which secured part of T & B's indebtedness, and it now claims an unsecured indebtedness of $533,600.75, plus interest.
 
 
 11
 T & B initiated an adversary proceeding against the Bank, Ballenger, and W.W. Williams Company of Florida, Inc. In this action, the Bank filed a cross-claim against Ballenger seeking damages on theories of breach of contract, fraudulent intentional misrepresentation, negligent misrepresentation, fraud and deceit, and equitable subordination. The Bank also sought an accounting as to certain joint venture funds unrelated to the highway construction contract.
 
 
 12
 The bankruptcy court denied the Bank recovery on all counts, finding that no agreement, express or implied, existed between the Bank and Ballenger and that Ballenger made no misrepresentations to the Bank, 64 B.R. 291. When the United States District Court for the Middle District of Florida affirmed the decision of the bankruptcy court in its order dated November 10, 1986, the Bank appealed to this court.
 
 ISSUES
 
 13
 The bank presents five issues on appeal: (1) whether the district court's application of a clearly erroneous standard of review is constitutional in a "non-core" proceeding involving traditional state contract and fraud claims; (2) whether an enforceable financing agreement exists between Ballenger and the bank; (3) whether Ballenger's alleged misrepresentations and material non-disclosures are actionable under Florida law; (4) whether Ballenger promised the bank "change order" payments earned by T & B; and (5) whether the doctrine of equitable estoppel precludes Ballenger from exercising a set-off.
 
 DISCUSSION
 A. Standard of Review
 
 14
 The Bank contends that the district court improperly applied a clearly erroneous standard of review to the bankruptcy court's finding of fact. It concedes that because the bankruptcy court decision in this case was issued after the effective date of the new Bankruptcy Rules, the new Bankruptcy Rule 8013 governs and it sets forth a clearly erroneous standard for district court review. The bank argues, however, that since the Supreme Court's decision in Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), circuit courts have drawn a distinction between the standard of review to be applied in "core" bankruptcy proceedings and the standard to be applied to a bankruptcy court's decisions on traditional common law contract and fraud claims. The Bank asserts that the clearly erroneous standard of Bankruptcy Rule 8013 remains applicable to "core" proceedings, but the application of that standard to traditional common law contract and fraud claims, which are commonly state law based, unconstitutionally vests a non-Article III bankruptcy judge with too much judicial power.
 
 
 15
 Ballenger contends that the district court properly applied the clearly erroneous standard from rule 8013 in reviewing the bankruptcy court's findings of fact.
 
 
 16
 For a period of time prior to the effective date of the new Bankruptcy Rules, as the Bank contends, the factual findings of the bankruptcy court were subject to complete review by the district court. The Sixth Circuit commented on this transitional period between the old Bankruptcy Rules and the new Bankruptcy Rules in In re Martin, 761 F.2d 1163 (6th Cir.1985), where the court stated:
 
 
 17
 In the period from December 24, 1982, the effective date of the judgment on Northern Pipeline Construction Company v. Marathon Pipeline Company, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), to August 1, 1983, the effective date of the new Bankruptcy Rules, the bankruptcy court's findings were reviewable de novo by the district court. White Motor Corp. v. Citibank, 704 F.2d 254, 263, 267 app. (6th Cir.1983). The new rules, however, accord the findings of the bankruptcy judge the same deference given the findings of a district judge....
 
 
 18
 761 F.2d at 1165. The bankruptcy court decision in this case was rendered after the effective date of the new Bankruptcy Rules. Therefore, the new rules apply. Bankruptcy Rule 8013 provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."
 
 
 19
 The district court noted that Adler v. Nicholas, 381 F.2d 168 (5th Cir.1967) was properly cited by the Bank for the proposition that, although the clearly erroneous doctrine is the usual rule on review of findings by the bankruptcy court, it is not the appropriate rule where the district court is in as good a position as the bankruptcy court to construe the terms of a written instrument and where no credibility issues are involved. The district court properly followed both rule 8013 and the Adler case in applying the clearly erroneous standard on all claims except the Bank's claim for breach of contract. On the Bank's claim for breach of contract, the district court, following Adler, examined anew and completely the documents which allegedly constituted Ballenger's financing agreement with the Bank regarding the debts of T & B.
 
 B. The Financing Agreement
 
 20
 The Bank contends that both the documentary evidence and the conduct of the three parties involved establish an enforceable financing agreement. It argues that the financing agreement was not a guarantee, i.e., a suretyship, subject to the Statute of Frauds, and therefore, the district court's focus on the Florida Statute of Frauds is inappropriate in this case.
 
 
 21
 Ballenger contends that no contract existed between it and the Bank and that no direct evidence indicates a contract with certain and definite terms.
 
 
 22
 In reviewing the factual findings of the bankruptcy court, this court must accept the findings unless they are clearly erroneous. In Re Greenbrook Carpet Co., Inc., 722 F.2d 659 (11th Cir.1984). This is so particularly when the findings have been affirmed by the district court. In Re Chalik, 748 F.2d 616 (11th Cir.1984).
 
 
 23
 The documents which allegedly constitute Ballenger's financing agreement to pay T & B's debt consist of four letters from Ballenger to the Bank. Applying the standard of review gleaned from the Adler case, the district court independently examined each of these letters, identifying the pertinent language. The court properly concluded that these four letters do not create an enforceable financing agreement. A binding and enforceable contract requires mutual assent to certain and definite contractual terms. Without a meeting of the minds on all essential terms, no enforceable contract arises. Webster Lumber Co. v. Lincoln, 94 Fla. 1097, 115 So. 498 (1927); O'Neill v. Corporate Trustees, Inc., 376 F.2d 818 (5th Cir.1967). The district court found that, even if the four letters could be considered a financing agreement, Florida Statutes Sec. 725.01, Florida's Statute of Frauds, renders it unenforceable as a "special promise to answer for the debt, default or miscarriage of another person." Section 725.01 requires that such an agreement or promise be "in writing and signed by the party to be charged." Moreover, to comply with the statute under Florida law, the writing must contain the essential terms of the agreement. First Guaranty Corporation v. Palmer Bank & Trust, 405 So.2d 186, 188 (2d D.C.A.1981). Having reviewed the content of the four letters, the district court held that the letters, read together, do not contain the essential terms of Ballenger's purported agreement to pay T & B's debt, as required by Florida's Statute of Frauds. The Bank has not convincingly demonstrated to this court how the bankruptcy court's findings are clearly erroneous. We therefore affirm the district court on this issue.
 
 C. Ballenger's Alleged Misrepresentations
 
 24
 The Bank further contends that Ballenger had a legal duty to accurately portray T & B's credit worthiness and to disclose T & B's subsequent financial failings. Ballenger contends that it did not intentionally nor negligently misrepresent facts to the Bank. The bankruptcy court found no intentional misrepresentation on Ballenger's part. As for negligent misrepresentation, Ballenger contends that the Bank was fully aware at all times that T & B was in financial difficulty, and that the Bank was in as good a position as Ballenger to obtain information concerning T & B.
 
 
 25
 The bankruptcy court determined that the Bank's allegations of intentional and negligent misrepresentation by Ballenger are both legally and factually unsubstantiated. Legally, the court found no basis upon which Ballenger might owe a duty to the Bank; factually, it found that the Bank's assertions are not borne out by the record.
 
 
 26
 The bankruptcy court's legal conclusions are subject to complete review by this court. See Monson v. First National Bank of Bradenton, 497 F.2d 135 (5th Cir.1974). Whether Ballenger owes any duty to the Bank is a question of law. Examining this question independently, we conclude, as did the bankruptcy court, that, on these facts, no specific duty was breached by Ballenger such that the Bank may hold Ballenger liable for its losses.
 
 
 27
 As stated above, this court must accept factual findings by the bankruptcy court unless they are clearly erroneous. In re Greenbrook Carpet Co., Inc., 722 F.2d 659 (11th Cir.1984). The bankruptcy court determined that the record does not support the Bank's allegations of misrepresentation. We note that the bankruptcy court found a lack of diligence on the part of the Bank in monitoring T & B's financial condition. The Bank has not presented any argument on appeal which adequately refutes this finding, and renders it clearly erroneous. We therefore accept the bankruptcy court's determination and affirm the district court on this issue.
 
 D. The "Change Order" Payments
 
 28
 The Bank contends that Ballenger promised to remit $201,500 in change order payments earned by T & B on four occasions, in four letters. The Bank contends that Ballenger made these promises with the intent to induce the Bank to continue lending money to T & B, despite T & B's deteriorating financial condition. Ballenger contends that the Bank is not entitled to recover these change order payments. It asserts the district court's finding that the change order payments never became due to T & B because T & B's default on the interstate jobs eliminated its right to those funds. Ballenger contends that the money it received, relating to the change orders was received under Ballenger's prime contract with the DOT. Because the money was not received by Ballenger on behalf of T & B for work completed by T & B, the Bank has no entitlement to these funds.
 
 
 29
 The bankruptcy court found that no enforceable agreement existed between Ballenger and the Bank and that no evidence established an agreement by Ballenger to restrict in any way its financial assistance to T & B. In affirming these factual findings, the district court found that the Bank's claim, that the four letters from Ballenger constituted unqualified promises to remit $201,500 in change order payments earned by T & B, fails to foreclose Ballenger's right to set-off.
 
 
 30
 In considering the Bank's arguments on appeal, we are not convinced that the findings of the bankruptcy court and the district court are clearly erroneous. Therefore, we affirm the decision that the Bank is not entitled to the change order payments.
 
 E. Equitable Estoppel
 
 31
 The Bank further contends that Ballenger is not entitled to assert a set-off against T & B's pre-petition earnings. It claims that by actively seeking and negotiating a financing agreement for its own benefit and for the benefit of its subcontractor, Ballenger became a party to the financing agreement and was bound by it. The Bank argues that the doctrine of equitable estoppel should apply to Ballenger's conduct because under Florida law, the existence of misrepresentation, even absent fraud, supports the application of this doctrine. It contends that Ballenger purported to make a financial commitment to the Bank to induce the Bank to continue lending money to T & B, but retained the right to cancel its commitment by making a set-off. The Bank concludes that to permit Ballenger to retain a nondisclosed set-off is contrary to the common honesty and fair dealing required by Florida law.
 
 
 32
 Ballenger contends that equitable estoppel does not apply on these facts. It asserts the findings of the bankruptcy court that Ballenger's conduct was in no way inequitable. Ballenger also contends that the Bank cannot invoke the doctrine of equitable estoppel for the first time on appeal. Ballenger further argues that even though the Bank's position is meritless, the Bank should be barred from introducing it in this court because it failed to do so in the district court.
 
 
 33
 Having examined the Bank's initial brief to the district court, we find that the Bank raised the issue of equitable estoppel. Thus, notwithstanding Ballenger's claim to the contrary, this issue was preserved and is properly before this court. Therefore, we address the merits and, in doing so, we affirm the findings of the bankruptcy court.
 
 
 34
 "Estoppel is an equitable doctrine which prevents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position." Matter of Garfinkle, 672 F.2d 1340, 1346-47 (11th Cir.1982). We have concluded that Ballenger owed no duty to the Bank. Thus, Ballenger did not breach a duty. The bankruptcy court found no improper conduct on the part of Ballenger and no support in the record for the Bank's contention that Ballenger's claim should be subordinated in favor of the Bank's claim. Nothing in the Bank's challenge to these findings indicates clear error.
 
 
 35
 Accordingly, the district court is affirmed.
 
 
 36
 AFFIRMED.
 
 
 
 *
 Honorable William Brevard Hand, Chief U.S. District Judge for the Southern District of Alabama, sitting by designation