In re Curtis Walter Robert HARRELL, a/k/a C.W.R. Harrell, Curtis Robert Harrell, Matthew Walter Harrell and Warner–Harrell Plantation, L.L.C., Debtors.

Curtis Walter Robert Harrell, a/k/a C.W.R. Harrell, Curtis Robert Harrell, and Matthew Walter Harrell, Plaintiffs,

v.

Wood & Associates of America, Inc., Fla–Land, L.L.C. and Dorada Real Estate Services, Defendants.

Bankruptcy Nos. 03–01070–3F1, 03–01071–3F1, 03–01072–3F1, 03–03249–3F1. Adversary No. 05–AP–00163–JAF.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Sept. 25, 2006.

James H. Post, Leanne McKnight Prendergast, Smith Hulsey & Busey, Jacksonville, FL, for Debtors/Plaintiffs.

Miriam G. Suarez, United States Trustee, Orlando, FL, for U.S. Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court upon the Complaint for declaratory relief filed by Plaintiffs, C.W.R. Harrell, Curtis R. Harrell and Matthew W. Harrell (collectively, the "Harrells"), the counterclaim filed by Defendants, Wood & Associates of America, Inc. ("Wood & Associates") and Fla–Land, L.L.C. ("Fla–Land"), for specific performance or alternatively damages caused by the Harrells' alleged breach of contract, the counterclaim filed by Defendant Dorada Real Estate Services ("Dorada") for damages based on the Harrells' alleged failure to pay a real estate commission, and the counterclaim filed by Defendants, Wood & Associates and Fla–Land for specific performance joining Osceola Land & Timber Corp. ("Osceola") as an involuntary party plaintiff and as an indispensable party holding title to the real estate in question under an Option Agreement with the Harrells. The trial of this proceeding was held on March 2 and March 3, 2006. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence presented and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

**A. Formation and alleged breach of the contract in dispute.**

On February 5, 2003, the Harrells each filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. On April 1, 2003, Warner–Harrell Plantation, L.L.C. ("Warner–Harrell Plantation") filed a petition for reorganization under Chapter 11. The cases of the Harrells and Warner–Harrell Plantation are being jointly administered.

At the time of the petition, the Harrells each owned an undivided 25% interest in approximately 3,735 acres of real property in Suwannee County, Florida. Sara Beth Harrell, C.W.R. Harrell's ("Mr. Harrell") daughter and Curtis R. Harrell's ("Curt Harrell") and Matthew W. Harrell's ("Matt Harrell") sister, owned the remaining 25% interest.

Steve Guinn ("Mr. Guinn") is the owner of Dorada and a licensed real estate broker. Mr. Guinn acknowledged that he may have learned from his friend, Walter Lawson ("Mr. Lawson"), that the Harrells had property for sale. (Tr. Vol. I at p. 118, lines 5–15.) Mr. Lawson is a real estate developer and one of the principal owners of the Florida limited liability companies, Tryland, L.L.C. ("Tryland") and Fla–Land. Mr. Guinn contacted the Harrells and solicited them to list their real estate with his agency, and the Harrells believed that he had the experience and contacts in South Florida and other areas to diligently use his best efforts to market the property and obtain the highest and best price. (Tr. Vol. I at p. 44, line 21 through p. 45, line 2.)

On June 26, 2003, the Court authorized the employment of Mr. Guinn and Dorada as real estate broker for the Harrells in their jointly administered Chapter 11 cases. On June 26, 2003, the Court entered an Order authorizing the Harrells to employ Mr. Guinn and Dorada as the real estate broker for the Harrells. In doing so, the Court expressly deleted from the proposed order the words "pursuant to the terms set forth in the application" and thereby expunged the boilerplate provisions of the exclusive listing agreement.

(Docket Entry 126, Case No. 03–01070–JAF; Pls.' Ex. 13.)

After his employment as broker was approved by the Court, Mr. Guinn brought a proposed contract for the purchase of 764 acres of land to the Harrells for their approval. This contract was with the purchaser, Wood & Associates or its assigns. The Court granted the Harrells' motion to sell the 764 acres to Wood & Associates (the "764 Acre Purchase"). At the closing, the Harrells learned that Wood & Associates had assigned the contract to Tryland. Mr. Guinn did not explain or disclose to the Harrells his connection with Wood & Associates, Tryland or its principals, which were still unknown to the Harrells at that time.

On August 19, 2004, the Harrells completed negotiations with Osceola to sell almost all of their land subject to an option to repurchase the property within two years (the "Option Agreement"). The sales price to Osceola was calculated to generate enough proceeds to pay all known allowed claims in full. The sale was consummated on November 18, 2004. Following Court approval, the Harrells paid the allowed claims of all of their creditors in full and bought out the interest of Sara Beth Harrell so that she was no longer required to be a party to any future transactions.

In essence, the Option Agreement was the equivalent of a financing arrangement, which allowed the Harrells the opportunity to reacquire their land within a certain period of time. Therefore, pursuant to the terms of the Option Agreement (Pls.' Ex. 23; Defs.' Ex. 26), the Harrells had the right to repurchase the property from Osceola if payment of the full amount due Osceola could be generated from the refinance or sale of some portion of the property, subject to minimum release price provisions. The Harrells also had the right to make principal payments of the Osceola debt by selling any portion of the property, subject to Osceola's right to retain such property according to the same terms and conditions of any such proposed contract. If Osceola elected to retain the property, the Harrells' debt to Osceola would be credited in an amount approximately equal to the proposed contract price. The Option Agreement gave Osceola ten days after receipt of an executed contract to exercise its right to retain the property under contract.

In a series of communications between January and December, 2004, Mr. Guinn proposed possible sale transactions between the Harrells and Wood & Associates as the purported purchaser. On or about December 3, 2004, Mr. Guinn submitted by facsimile the first page of a draft contract to the Harrells which proposed a sale of approximately 600 acres of property to Wood & Associates. The Harrells responded by marking up the same one-page draft to reflect an increase in the price per acre and shortening the closing period, among other changes, and returned the document to Mr. Guinn by facsimile. (Pls.' Ex. 24; Defs.' Ex. 27.) These communications were the beginning of the negotiations that form the basis of the disputed contract.

On the morning of December 21, 2004, Mr. Guinn set up a meeting with the Harrells by telling them that he was "coming over with something for them to sign". (Tr. Vol. I at p. 137, lines 18–21.) The Harrells' testimony regarding what was said and done at that meeting is significantly different than Mr. Guinn's version of the meeting. According to Mr. Guinn, he consolidated the negotiations into a clean contract and presented the entire contract to the Harrells for approval. (Tr. Vol. I at p. 138, line 8.) Five additional terms were written in at the bottom of the

signature page. (Tr. Vol. I at p. 138, lines 6–19.) As the sellers were the first to sign the contract, Mr. Guinn explained to the Harrells that the contract was not final until the buyer had signed it and the condition contained in it relative to Osceola's approval had been satisfied.[1] (Tr. Vol. I at p. 139, lines 18–19.) All three Harrells read and then signed the contract to sell over 600 additional acres of real property to Wood & Associates. (Tr. Vol. I at p. 139, lines 16–17.)

Mr. Harrell, Curt Harrell and Matt Harrell each testified at trial that on December 21, 2004, they executed and delivered the signature page of the contract prepared by Mr. Guinn after confirming with Mr. Guinn that no contract would be final or binding on them without an opportunity for them and their counsel to review and approve the proposed final agreement. (Tr. Vol. I at p. 60, line 20 through p. 61, line 2; Tr. Vol. II at p. 116, lines 14–16 and p. 117, lines 2–5; Tr. Vol. II at p. 143, lines 13–17.) Among other assertions, the Harrells testified that the meeting with Mr. Guinn lasted approximately five to ten minutes, that Mr. Guinn informed the Harrells that their signing of the contract was only a way to move forward in the negotiation process, and that Mr. Guinn provided only the signature page of the document with handwritten provisions that were on the document prior to the meeting.

The testimony regarding what transpired directly after the meeting the morning of December 21, 2004, is so incongruous that even Defendants cannot agree as to what certainly occurred. Somewhere in the labyrinthine skein of facts proffered by the parties lies the truth, but the Court is satisfied that at some point on December 21, 2004, Mr. Guinn provided the document signed by the Harrells to Mr. Lawson, as a facsimile in the record shows that Mr. Lawson faxed the document to his attorney at 6:18 p.m. on December 21, 2004. (Defs.' Ex. 31.) Indeed, Mr. Lawson testified at trial that (i) he met with Mr. Guinn "on the road" on the afternoon of December 21, 2004 (Tr. Vol. II at p. 75, lines 14–20), (ii) Mr. Guinn asked Mr. Lawson if they could go back to Mr. Lawson's office (Tr. Vol. II at p. 75, lines 23–25) and (iii) the two went back to Mr. Lawson's office and made a copy of the contract (Tr. Vol. II at p. 75, line 25 through p. 76, line 2).

On December 27, 2004, pursuant to Mr. Lawson's instructions, Mr. Guinn obtained the signature of Mr. Lawson's son-in-law, Kenneth Wood ("Mr. Wood") on behalf of Wood & Associates, to the proposed contract. (Pls.' Ex. 27; Defs.' Ex. 32.) On January 5, 2005, Mr. Guinn faxed a copy of the proposed contract, executed by Mr. Wood, to Mr. Harrell who forwarded the document to his attorneys. (Defs.' Ex. 33.) Mr. Harrell did not review the document at that time because it was not a final agreement for the Harrells. (Tr. Vol. II at 131, lines 14–21.) Instead, the Harrells, consistent with their ordinary practice, turned the proposed contract over to their attorneys for their review and waited for their attorneys to tell them what to do. (Tr. Vol. II at p. 119, lines 6–10.) From January 5, 2005 through January 24, 2005, the Harrells had no communication with their attorneys, Mr. Guinn, Mr. Lawson or

---

1. The contract explicitly states:
 This contract is expressly contingent upon the approval of OSCEOLA LAND AND TIMBER, CORP.
 . . . .
 The Effective Date will be the date Buyer receives written notice, by U.S. Mail or hand delivery, of approval of contract by Osceola Land and Timber, Corp.
 Approval of contract by Osceola Land and Timber, Corp. shall be given no later than 14 days from Contract Date.
 (Pls.' Ex. 34, p.6).

Mr. Wood regarding the proposed contract other than being copied on correspondence issued by their attorneys.

On January 5, 2005, Bryan Putnal ("Mr. Putnal"), an attorney for the Harrells, transmitted the contract to Osceola along with a letter requesting Avery Roberts ("Mr. Roberts"), president of Osceola, to review the contract and to notify him as to whether Osceola would purchase the property itself pursuant to the terms of the Option Agreement. (Pls.' Ex. 28; Defs.' Ex. 35.) On January 6, 2005, Mr. Roberts reviewed the contract and determined that Osceola would not elect to retain the property. This determination was reflected at the bottom of a letter from Mr. Terry McDavid, the attorney for Osceola and Mr. Roberts at the time of contract formation (*see* Tr. Vol. I at p. 224, lines 13 through 17), to Mr. Jeffrey Spencer ("Mr. Spencer"), a commercial loan officer for the Farm Credit of North Florida, ACA,[2] regarding Osceola's Option Agreement, which explicitly states, "We are not buying this. Let Jeffrey know."[3] (Defs.' Ex. 37.) In addition, Mr. Roberts testified at trial that this statement was in fact written by him to inform his assistant, Denise Howard ("Ms. Howard"), that Osceola did not wish to retain the property. (Tr. Vol. I at p. 232, line 13 through p. 233, line 20.) Ms. Howard communicated this decision to Mr. Putnal by e-mail on January 6, 2005. (Defs.' Ex. 26.) No communication was ever submitted to the Harrells stating that Osceola was electing to not retain the property.

Pursuant to the terms of the contract requiring Osceola to approve the contract, Mr. Roberts penciled in revisions on the contract that were forwarded to Mr. McDavid. (Defs.' Ex. 38.) Mr. McDavid then conferred with Mr. Putnal resulting in a letter on January 7, 2005, from Mr. Putnal to Mr. McDavid confirming the revisions. (Pls.' Ex. 29; Defs.' Ex. 39.) In this letter, Mr. Putnal acknowledged Osceola's revisions and informed Mr. McDavid that certain modifications would be made while others would not. (*Id.*) In closing on the January 7, 2005 letter, Mr. Putnal stated that once he made the appropriate revisions to the contract as proposed by Osceola, that he would "furnish the same [the contract with the new revisions] to [Mr. McDavid] to obtain the written consent of Osceola to the sale." (*Id.*) Mr. Putnal then forwarded the amended contract to counsel for Wood & Associates along with a letter dated January 11, 2005. (Pls.' Ex. 32; Defs.' Ex. 43.) This letter requested Wood & Associates to initial the changes that were required by Osceola. Mr. Putnal further advised that upon confirmation that the changes had been made, the contract would be acceptable to Osceola. Mr. Roberts confirmed that this letter was accurate. The requested changes were initialed by Mr. Wood on January 15, 2005. The now initialed contract was faxed to Mr. Putnal on January 18, 2005, confirming that the changes had been made.

At no time after Osceola modified the disputed contract did the Harrells review the changes. As a result, the Harrells were never given the opportunity to agree to the suggested changes made by Osceola. Instead, Osceola simply requested that the buyer accept the changes, and upon receipt of approval of such changes, the pro-

---

**2.** Farm Credit of North Florida, ACA is a bank to which the Harrells were indebted for their property, and to which they were required to make payments under their Chapter 11 Plan.

**3.** "Jeffrey" is in reference to Mr. Spencer.

posed contract would be acceptable to Osceola.

There are no documents in evidence exhibiting the written approval of Osceola to the proposed sale. In addition, Mr. Roberts testified that Osceola was never given the opportunity to give its final approval:

Q Have you ever been asked by anyone to provide your approval or disapproval for the draft contract that you were furnished?

A In the final state?

Q Yes.

A No.

Q And have you ever given your approval or disapproval to the contract?

A And serve that in writing back to Smith Hulsey?

Q That's correct.

A No.

(Tr. Vol. I at p. 227, lines 6–16).[4] This undisputed fact was also admitted by the representative of defendant Fla–Land, Mr. Lawson, at trial:

Q You knew that this contract was expressly contingent upon Osceola's approval, correct?

A Yes, sir.

Q And to this day Osceola has not approved this contract, correct?

A No, sir.

(Tr. Vol. II at p. 62, lines 16–21.)

Approximately one week later, Mr. Guinn received a call from the Harrells' attorney requesting additional time for the Harrells to consider another offer on the property that is the subject of the disputed contract. Mr. Guinn contacted Mr. Lawson who declined the request. On January 27, 2005, counsel for Wood & Associates confirmed by letter a telephone discussion with Mr. Putnal denying the request and confirming that the contract was binding and that Wood & Associates was proceeding with its due diligence. (Pls.' Ex. 34; Defs.' Ex. 46.) Mr. Putnal followed up the conversation with a letter outlining the proposal the Harrells wanted to consider. (Pls.' Ex. 35; Defs.' Ex. 49.) This request was again denied. (Pls.' Ex. 36; Defs.' Ex. 48.) Wood & Associates' counsel, on February 3, 2005, sent another letter to Mr. Putnal confirming the effective date of the contract, confirming the due diligence period was running, advising that a survey was scheduled and requesting confirmation that the escrow funds had been transferred from Mr. Guinn. (Pls.' Ex. 37; Defs.' Ex. 50.) Mr. James Post ("Mr. Post"), another attorney for the Harrells, responded on February 4, 2005, with more details about the other proposal the Harrells wanted to consider as well rejecting the requests contained in the letter of February 3, 2005. (Pls.' Ex. 38; Defs.' Ex. 51.)

As stated by Mr. Post in his February 4 letter to Wood & Associates' attorney and Mr. Guinn:

On January 24, 2005, I advised your real estate broker, Mr. Steve Guinn, that the Harrells would require more time to decide whether to accept or reject the proposed contract submitted by your clients. I advised Mr. Guinn that the Harrells have also been discussing a

---

4. The January 11, 2005 letter from the Harrells' attorneys to Wood's attorneys (Pl.Ex.44) did not satisfy the express condition precedent notice requirement because (i) the letter was not given by or on behalf of Osceola Land (the Harrells' attorneys did not represent Osceola Land and were not authorized by Osceola Land to give any type of notices to any persons) and (ii) the letter did not state or "constitute" Osceola Land's "approval of the contract"—it only expressed the opinion of Harrells' attorneys that Osceola Land may deem the contract to be acceptable if the requested changes are made, (iii) the letter was sent by facsimile (not U.S. Mail or hand delivery).

proposal with a local dairy company which would entail a long-term prepaid lease of their property. If this lease transaction is consummated, it would allow the Harrells to keep title to the property which has been in their family for several generations for the benefit of the grandchildren.

Although the Harrells do not want to terminate all negotiations with your client regarding this sale, they intend to pursue to this lease opportunity which, unlike a sale, would allow them to keep this property in their family.

We understand that you have taken the position that your clients obtained an enforceable contract on January 18, 2005. Although we do not agree with your position, I think you will agree that litigation over this matter would not be a constructive option for our respective clients. In any event, please be advised that our firm has never represented Osceola Land & Timber Company and, because there is no enforceable contract between our clients at this time, our firm will not be taking the actions requested in your February 3 letter.

The Harrells will soon know whether or not the dairy lease proposal is viable and, at that time, we hope to have a constructive dialogue with you regarding the resolution of this matter.

(*Id.*)

Mr. Guinn delivered the escrow check to the office of the Harrells' attorney (Defs.' Ex. 52), which was returned on February 9, 2005. (Pls.' Ex. 39; Defs.' Ex. 53.) On February 17, 2005, Wood & Associates' counsel advised Mr. Post that they had been authorized to file suit and asked if Mr. Post would accept service for his clients. (Pls.' Ex. 40.)

### B. *Credibility of the witnesses.*

In proving whether a contract was formed, all parties attacked the credibility of the various witnesses in an effort to prove the veracity of events as proposed by each party. As the trier of fact, it is the function of the Court to evaluate the credibility of the witnesses, weigh the evidence, and based on the greater weight of the evidence, determine what more likely happened in regard to the events surrounding the execution of the contract on December 21, 2004. The Court must therefore study all evidence in the record, as well as draw inferences from circumstantial evidence proffered by the parties. Each disputed issue will be discussed in turn.

### i. *Receipt of the entire contract to sign versus the signature page on December 21, 2004.*

The testimony of Mr. Harrell at his deposition on February 17, 2006, indicates that the entire contract was presented to all three Harrells on December 21, 2004. Specifically, Mr. Harrell's deposition states:

Q Okay. So after all of the marking up and everything that was done on that, then—if you can mark that as 11.

. . .

Let me hand you Defendant's 11 and ask if you can identify that?

A This is the result of all of that (indicating).

Q Okay. And so this is—*this is the clean version that had everything, the numbers and everything in it before it was then presented to you from Mr. Guinn for signatures as from the buyer or from the sellers?*

. . . .

. . . . When—rather than take these other contracts, which we've just gone

through that have all of these markings on them, *a clean contract was presented to you that had no signatures on it; is that your recollection?*

A *That's my recollection.*

Q Okay. So you and your two sons were the—and the last communication that we just looked at Defendant's 10 was December 17th, and the page 113 of Defendant's 11 shows that y'all signed it on December 21 st?

A Yes.

(Dep. of Mr. Harrell at p. 67, line 17 through p. 68, line 22) (emphasis added.) Additional questioning at Mr. Harrell's deposition further indicates that the Harrells had the contract on December 21, 2004, and read it:

Q Okay. On Exhibit 11, the contract, *if you could turn to the signature page.* And can you identify your signature on that page?

A Yes.

Q And which one is it?

A The top one.

Q Okay. The first line under seller?

A First line under seller.

Q And the second line, is that Curt's signature?

A That's correct.

Q And the third line, is that Matt's?

A Correct.

Q And then the initials that are down at the bottom of that page, those are your initials?

A That's correct.

Q Okay. And yours is the one closest to the printing?

A Yes.

Q *Is this an accurate copy of the contract that you signed that day?*

. . . .

[A] *It appears to be.*

. . . .

Q Is there—*is there anything about this contract in looking at it that does not appear to be what was in the contract you signed that day?*

A Yes, the *$20,000 deposit was unacceptable.* I thought we made that clear.

(Dep. of Mr. Harrell at p. 72, line 8 through p. 73, line 10) (emphasis added.)

As proof that the Harrells had only received the last page of the contract upon signing, Mr. Harrell testified at trial that if the disputed contract had been intended to be a binding, final contract, then the Harrells would have initialed every page of the contract, not just the last page. (Tr. Vol. II at p. 118, lines 9–14.) However, on cross-examination, Mr. Harrell conceded that only pages containing handwritten changes are initialed, not every page. (Tr. Vol. II at p. 121, line 11 through p. 122, line 10.) This was also confirmed by documents in evidence. For example, the contract for the 764 Acre Purchase (Pls.' Ex. 12) is a final contract that was not initialed anywhere; it was only signed on the last page. (Tr. Vol. II at p. 120, line 13 through p. 121, line 13.) In addition, the record contains a contract signed by all of the Harrells with initials only on two pages where changes had been written in.[5] (Pls.' Ex. 25.) Thus, the facts from the record show that the only terms in the contract that were changed or handwritten were on the last page and therefore only that page required the Harrells' initials.

Moreover, it is important to mention the use of errata sheets by the Harrells. According to the procedural history of the case as reflected on the docket, Mr. Harrell filed an errata sheet to correct his

---

**5.** This contract was never closed on because Sarah Beth Harrell declined to accept it.

deposition testimony (the deposition occurred on February 17, 2006) on March 1, 2006, one day before trial. Nowhere in the errata sheet does Mr. Harrell state that Mr. Guinn only presented the Harrells with the signature page of the disputed contract. (*See generally* Dep. of Mr. Harrell.) Curt Harrell was the first of the Harrells to take the stand on March 2, 2006. During his testimony, Curt Harrell revealed that the Harrells were only given the signature page of the disputed contract to sign. (Tr. Vol. I at p. 98, line 22 through p. 99, line 6.) In fact, Curt Harrell revealed this for the first time after a lunch break, despite the mention of the disputed contract two times prior to the break.[6]

At 10:14 A.M. on March 3, 2006, Mr. Harrell filed a *second* errata sheet, which for the first time corrected Mr. Harrell's deposition to reflect that the Harrells had only been presented with the signature page of the disputed contract as opposed to the disputed contract in its entirety. (Docket Entry 74, Case No. 05–00163.) To wit, the second errata sheet corrected Mr. Harrell's deposition statement that he "always read[s] through contracts" (Dep. of Mr. Harrell at p. 77, line 3) to state that he "always read[s] over final contracts before [he] signs them, but [he] was only presented with the final page of [the disputed contract] at [his] office on December 21." (Am. Errata Sheet to Dep. of Mr. Harrell at p. 2.) In addition, the second errata sheet changed Mr. Harrell's deposition from stating that the disputed contract "was not stapled together in total contract form since [the Harrells] were still negotiating many of these issues" to state that the disputed contract "was not stapled together, [the Harrells] only saw the last page, and [the Harrells] were still negotiating many of these issues." (Am. Errata Sheet to Dep. of Mr. Harrell at p. 2.) This new errata sheet was submitted before Mr. Harrell took the stand to testify.

### ii. *Reading over the disputed contract, agreement to its terms, and signing by the Harrells.*

There is much controversy over whether the Harrells actually read over the disputed contract in its entirety, understood all provisions, agreed to all material terms, and signed the disputed contract with the intent to enter into a binding agreement with Wood & Associates. The Harrells unanimously assert that the meeting only lasted a short while, roughly five to ten minutes. This fact, they contend, proves that there was not enough time for all three of the Harrells to thoroughly peruse the contents of the document, agree to all terms, and sign the document so Mr. Guinn could present their offer for Wood & Associates' acceptance. On the contrary, Mr. Guinn attests that his meeting with the Harrells lasted approximately one half-hour. In addition, the Harrells claim that Mr. Guinn prepared a clean document but made written revisions prior to his arrival; alternatively, Mr. Guinn proclaims that he presented the Harrells with a clean document and made written modifications

---

6. In the first instance, Curt Harrell described his recollection of the events that transpired on December 21, 2004:

> [Mr. Guinn] brought in the *amended contract* with some handwritten amendments at the bottom of the signature page, I believe.

(Tr. Vol. I, p. 59, lines 15–17) (emphasis added.) In the second instance, Curt Harrell was responding to a question from Mr. Post:

> Q The document that was provided to you by Mr. Guinn on December 21, there were handwritten provisions on the signature page at the bottom, correct?
> A Yes, sir.

(Tr. Vol. I, p. 62, lines 19–22.)

at the Harrells' direction during the meeting.

The evidence in the record reveals that the Harrells had been negotiating with Wood & Associates over the property involved with the disputed contract since, at the earliest, August 27, 2004, or, at the latest, November 5, 2004. On August 27, 2004, Mr. Guinn left Mr. Post a voicemail message indicating that he had a seller wishing to purchase some of the disputed property, namely, the commercial property, for $5,000 an acre. (Defs.' Ex. 21.) On September 22, 2004, Mr. Guinn faxed a proposed contract to Mr. Post for a sale of the disputed property. (Defs.' Ex. 23.) This contract was signed by the Harrells, but it was not signed by Mary Beth Harrell. (*Id.*) Mr. Post, on November 5, 2004, sent a letter to Mr. Guinn explaining that Mary Beth Harrell never accepted the proposed contract because she was "not a motivated seller ... because her undivided 25% interest in the property [would] be transferred to or for the benefit of" (Pls.' Ex. 21; Defs.' Ex. 24) the Harrells in association with their Chapter 11 Plan. However, Mr. Post informed Mr. Guinn in the same letter that the Harrells would entertain a different contract from Wood & Associates after their Chapter 11 Plan had been confirmed on November 15, 2004. (*Id.*) In response, Mr. Wood signed a proposed contract for the purchase of the disputed property on November 16, 2004, which offer would be revoked after November 23, 2004. (Defs.' Ex. 25.)

As the Court concludes, this proposed contract was the catalyst for the negotiations surrounding the disputed contract. On December 3, 2004, Curt Harrell faxed a counteroffer to Mr. Guinn, which specified that Osceola owned the property, increased the purchase price and shortened the closing date. (Pls.' Ex. 24; Defs.' Ex. 27.) Curt Harrell then faxed another counteroffer to Mr. Guinn on December 7, 2004. (Pls.' Ex. 25; Defs.' Ex. 28.) This new counteroffer addressed the $5,000 deposit, which was modified to $50,000, as the Harrells were unwilling to "tie up th[e] property for 90 days for $5,000 ...." (*Id.*) On December 17, 2004, Curt Harrell again faxed a new counteroffer to Mr. Guinn, reflecting further pricing adjustments. (Defs.' Ex. 30.) Specifically, Curt Harrell advised Mr. Guinn that the Harrells would accept $2,500 per acre for "[a]ll acreage (less commercial)", and they would accept $6,500 per acre for the commercial property. (*Id.*)

The next piece of evidence in the record is the disputed contract. The purchase price incorporates Curt Harrell's counteroffer of $2,500 per acre for all non-commercial acreage, and $6,500 per acre for commercial acreage. (Pls.' Ex. 25; Defs.' Ex. 31.) The deposit had been changed to $20,000, and the closing date was moved to 75 days from the Effective Date. (*Id.*) The disputed contract also has five written additions at the bottom of the signature page, including a reduction in the purchase price of certain parcels to $1,500 per acre and incorporating Osceola's acceptance as the Effective Date. (*Id.*) Mr. Harrell, Curt Harrell and Matt Harrell all signed and dated this page and each initialed the five additions. (*Id.*)

Mr. Harrell testified during his deposition that his professional background, for most of his career, was as a mortgage banker. (Dep. of Mr. Harrell at p. 6, line 3.) He accumulated experience throughout the industry, but ultimately started his own company, Paradigm Mortgage Associates. (*Id.* at p. 6, lines 5–7; Errata Sheet to Dep. of Mr. Harrell at p. 1.) As such, Mr. Harrell claimed a lot of experience dealing with contracts in general and specifically, real estate contracts. (Tr. Vol. II at p. 119, lines 19–21.)

The Harrells consistently assert that they simply did not read over the contract, that Mr. Guinn added the additions before he arrived at the Harrells' home, and that they never agreed to the $20,000 deposit. Besides the evidence that there were several weeks, if not months, of negotiations between the parties, Mr. Harrell's own deposition testimony refutes this assertion. As aforementioned, Mr. Harrell revealed that he "always read[s] through contracts." (Dep. of Mr. Harrell at p. 77, line 3.) In addition, Mr. Harrell revealed that he was a sophisticated businessman who had significant experience with real estate contracts. (Tr. Vol. II at p. 119, lines 19–21.) Yet during his deposition, and reiterated during his testimony at trial, Mr. Harrell stated that he simply did not read over this disputed contract and would not have agreed to its terms if he had:

Q *After reading this contract* that Mr. Guinn presented to you and it's got $20,000 on here instead of $50,000, why didn't you change that—

A *I didn't notice it.*

Q —if you didn't like it?

A I didn't notice it. Mr. Post brought that to my attention.

Q You or somebody had noticed it on all of these other contracts and had changed, written memos about it, but then when this one came through instead of 5,000 it says 20 you didn't—

A I missed it.

Q You—all three of you missed it?

A *Well, my sons are not accustom [sic] to—we didn't think we had to check behind every single sentence on the contract to be honest with you.*

Q You weren't—that wasn't an issue that you were concerned about in terms of how much money might come to you the next week?

A Well, clearly it was. Clearly it was.

Q Anything else that was on that document that you disagreed with or didn't like or—

A I don't recognize anything that I can recall. Frankly, I do not recall that day as well as I would prefer to.

Q Okay. *Did you keep a copy of the document?*

A Well, *certainly we kept a copy of it.*

Q After you signed it that day or before you signed it?

A Probably both, *before and after I would imagine.*

(Dep. of Mr. Harrell at p. 82 line, 11 through p. 83, line 16; Tr. Vol. II at p. 133, line 24 through p. 134, line 24) (emphasis added.)

Moreover, what seems even more telling is Mr. Harrell's own statement at trial that he inserted the name "A.R. Kinsey" at the end of the second-to-last written addition on the signature page. (Tr. Vol. II at p. 117, lines 12–23.) This simple statement exhibits a fatal flaw in the Harrells' presentation of the facts of the case: two contradictions crush the Harrells' argument like kudzu on a young sapling. It is specious to claim that Mr. Guinn presented the Harrells with a contract including pre-written additions when there is nothing in the record to suggest that Mr. Guinn even knew of the existence of a residence that would not be included in the final binding contract. Furthermore, it is implausible to propose that the Harrells did not read over the final contract, yet Mr. Harrell specifically designated that certain acreage would be excepted from the proposed sale for this resident, A.R. Kinsey.

All three Harrells uniformly testified at trial that they routinely relied upon advice of counsel prior to signing any document

that was to become a final, binding agreement. Curt Harrell agreed during testimony that had he and his family intended the document to become a final contract, he would have obtained legal advice before signing. (Tr. Vol. I at p. 60, line 25 through p. 61, line 2.) Mr. Harrell testified that it was the Harrells' "practice to send everything to the [law firm of Mr. Post and Mr. Putnal] for review in much the same fashion that the buyers do in providing it to counsel." (Tr. Vol. II at p. 119, lines 6–8.) And Matt Harrell acknowledged that counsel would have extensively reviewed any document intended to become a binding agreement before the Harrells would have signed it. (Tr. Vol. II at p. 143, lines 18–22.)

Yet, in his deposition, Mr. Harrell confirmed the participation of counsel in this contract:

Q Okay. And again, at that time [of formation of the disputed contract] you were represented by counsel?

A Yes.

Q Did your attorney have any involvement in any of these negotiations or agreements resulting in this document number 11 [the disputed contract]?

A It was our practice to develop a plan, run it through counsel.

Q And didn't Mr. Guinn during the course of all of this have a lot of communication directly with your attorneys?

A Yes.

(Dep. of Mr. Harrell at p. 84, lines 1–12.) Mr. Harrell then stated that upon receipt of the contract he received from Mr. Guinn, he "immediately . . . faxed it to Mr. Post." (Tr. Vol. II at p. 131, lines 18–19.)

**7.** FAR/BAR is the acronym assigned to contracts prepared by the Florida Association of

### C. *Relationship between the Harrells and Mr. Guinn.*

In February 2003, a few days after the Harrells filed their Chapter 11 petitions, Mr. Guinn introduced himself to the Harrells as a real estate broker doing business as Doradá. (Tr. Vol. I at p. 165, line 6 through p. 166, line 16.) Mr. Guinn told the Harrells that he heard that the Harrells may be selling their property and that he, as an experienced real estate broker in Northwest Florida, could assist them in selling their Suwannee County property for the highest and best value. (Tr. Vol. I at p. 44, line 9 through p. 45, line 2.)

After a series of communications, the Harrells were persuaded to hire Mr. Guinn for the purpose of marketing and selling approximately 800 acres of their property. The Harrells made their decision based on Mr. Guinn's representations regarding his experience and the diligent and continued efforts he would take to market the property and obtain the highest and best price. (Tr. Vol. I at p. 44, line 24 through p. 45, line 2, and p. 45, lines 10–13.) As a condition of employment, Mr. Guinn requested an exclusive listing agreement (the "Listing Agreement") with the Harrells, which they signed on March 4, 2003. (Pls.' Ex. 10; Defs.' Ex. 2.) The Listing Agreement was to remain in effect for 18 months (until September 4, 2004). The Harrells informed Guinn that his employment was subject to this Court's approval. The Listing Agreement was a standard agreement prepared by FAR/BAR [7], not Mr. Guinn. (Tr. Vol. I at p. 173, line 24 through p. 174, line 5.) The Listing Agreement expressly provided in Paragraph 8:

BROKERAGE RELATIONSHIP: Under this Agreement, Broker will deal

Realtors and the Florida Bar.

honestly with and fairly with Seller, will disclose all known facts that materially affect the value of the property which are not readily observable to the buyer and will account for all funds entrusted to Broker. Seller acknowledges that this agreement does not create an agency or transactional brokerage relationship with Broker.

(Pls.' Ex. 10; Defs.' Ex. 2.) As real estate broker for the Harrells, Mr. Guinn was under a duty to inform the Harrells of any circumstances that might influence his loyalty to them or that might reasonably be expected to influence his clients in negotiations with any prospective purchasers.[8]

In reliance on Mr. Guinn's representations, on June 4, 2003, the Harrells filed an application with the Court for authorization to employ Mr. Guinn, doing business as Dorada, as the Harrells' real estate broker. The application expressly stated that Mr. Guinn was to "represent and assist" (Pls.' Ex. 10; Defs. Ex. 6) the Harrells in selling the property by listing the property for sale and soliciting bids from prospective buyers. Accompanying the Harrells' application was an affidavit signed by Mr. Guinn that he did not hold any interest adverse to the debtors and was a disinterested person. (Pls.' Ex. 11.) Mr. Guinn's affidavit reflects that he sought employment as real estate broker for the Harrells. On June 26, 2003, the Court entered an Order authorizing the Harrells to employ Guinn and Dorada as the "real estate broker for the Harrells". (Docket Entry 126, Case No. 03–01070–JAF; Pls.' Ex. 13.)

During their relationship with Mr. Guinn, the Harrells shared with him confidential information regarding their financial situation, their Chapter 11 cases and the property itself, including the Harrells' opinions regarding property values, strategy for sale and concerns regarding the marketing of the property. The Harrells shared this and other information with Mr. Guinn with the understanding that he would use his expertise to market the property to a wide number of prospective purchasers and to bring the highest of several offers to the Harrells.

As part of his efforts to procure a buyer, Mr. Guinn contacted Mr. Lawson, a developer living in Live Oak, whom Mr. Guinn had known for approximately 17 years. (Tr. Vol. 1 at p. 121, lines 9–14.) Mr. Lawson was one of the first prospects contacted as he lived in Suwanee County and was familiar with the property in that area. (*Id.*) On June 24, 2003, Mr. Guinn notified the Harrells of an undisclosed prospective purchaser who did "not want his name revealed until" a contract was signed. (Pls.' Ex. 12.) Although Mr. Lawson was contacted in February or March, he did not make any offer on the property until June 24, 2003.

On September 23, 2003, Mr. Guinn sent a letter to counsel for the Harrells stating that the undisclosed prospective purchaser was willing to commence negotiations for the property. (Pls.' Ex. 14; Defs.' Ex. 8.) The Harrells commenced negotiations with the undisclosed purchaser, through Mr. Guinn and, eventually, accepted an offer. The Harrells accepted the offer based on their belief that Mr. Guinn had listed and actively marketed the property during the entire six months that had elapsed, and that the undisclosed purchaser's offer was the best and only offer they were going to receive.

---

8. Mr. Guinn was present at the hearing on the Harrells' application for authorization to employ him as their broker and said nothing to suggest that he did not regard himself as being employed by the Harrells. At the trial of this adversary proceeding, Mr. Guinn denied that he was employed by the Harrells or had any fiduciary relationship with them.

On October 3, 2003, the Harrells executed a contract presented by Mr. Guinn to sell approximately 764 acres of their Suwannee County property to Mr. Guinn's undisclosed purchaser subject to Court approval (the "764 Acre Purchase"). On October 6, 2003, Mr. Guinn transmitted to the Harrells the final version of the 764 Acre Purchase with the sale price of $1,400 per acre. (Pls.' Ex. 15.) When Mr. Guinn delivered the executed contract, the Harrells were advised by Mr. Guinn that the prospective purchaser of the 764 acres was Wood & Associates whose president and director, Mr. Wood, was a Jacksonville resident. The Harrells did not know the prospective purchaser and Mr. Guinn failed to disclose to the Harrells that Mr. Wood was a "strawman" who had no knowledge or interest in the property and who was the son-in-law of the real party-in-interest, Mr. Lawson.

On October 14, 2003, the Harrells filed a motion seeking the Court's approval of the 764 Acre Purchase. (Pls.' Ex. 16.) On December 3, 2003, the Court granted the motion approving the sale of the 764 acres from the Harrells to Wood & Associates. (Pls.' Ex. 17.) On February 3, 2004, the Harrells closed on the sale of the 764 Acre Purchase. At the closing, the Harrells learned that Mr. Wood had assigned his interest in the contract to Tryland, LLC. Mr. Guinn did not explain or disclose to the Harrells his connection with Mr. Wood, Tryland or its principals, which were still unknown to the Harrells at that time. Also at the closing, the Harrells paid Mr. Guinn a sales commission of $63,971.88 for acting as their broker in the transaction. (Pls.' Ex. 19.)

The Harrells testified at trial that, through discovery taken after the commencement of this adversary proceeding on May 16, 2005, they learned for the first time that (i) Mr. Guinn never listed any portion of the Harrells' 764 acres of property with the Multiple Listing Service or any other such service (Dep. of Mr. Guinn at p. 83, lines 19–21), (ii) Mr. Guinn never advertised any portion of the property for sale (Dep. of Mr. Guinn at p. 83, lines 15–18; Tr. Vol. I at p. 125, lines 13–21), (iii) Mr. Guinn showed the property to only one person, Mr. Lawson (Dep. of Mr. Guinn at p. 47, lines 6–21; Tr. Vol. I at p. 122, lines 3–7), (iv) Mr. Guinn and Mr. Lawson had been personal friends for more than seventeen years and, during that period of time, Mr. Guinn routinely brought Mr. Lawson tracts of land in North Florida and Georgia for Mr. Lawson's possible purchase (Dep. of Mr. Guinn at p. 13, line 24 through p. 14, line 1 and p. 26, lines 4–9; Tr. Vol. I at p. 118, lines 16–20 and p. 119, lines 1–5), (v) Wood & Associates never intended to close on any contract it signed with the Harrells, only serving as a "strawman" for Mr. Wood's father-in-law, Mr. Lawson (Dep. of Mr. Guinn at p. 12, lines 23 through p. 13, line 17, p. 32, lines 2–24, and p. 82, lines 17–22; Tr. Vol. I at p. 134, lines 6–24), and (vi) Mr. Lawson did all of the negotiations of the 764 Acre Purchase with Mr. Guinn. (Dep. of Mr. Guinn at p. 32, lines 2–24.)

Following the 764 Acre Purchase, Mr. Guinn advised the Harrells that he wanted to bring offers to the Harrells for the purchase of more of the property but that he needed a letter from the Harrells which "protected" him in regard to the payment of any prospective real estate commission. Still unaware of Mr. Guinn's relationship with Mr. Lawson, the Harrells agreed by letters dated January 13, 2004 (Pls.' Ex. 18) and March 1, 2004 (Pls.' Ex. 20), to pay Mr. Guinn a real estate commission if a sale was closed on any contract procured by Mr. Guinn. With respect to these letters, Mr. Guinn stated that although he did remember asking the Harrells' attorney for the two letters "protecting" his pro-

spective commission, he (i) did not receive the January 13, 2004 letter (Dep. of Mr. Guinn at p. 49, lines 6–21) and (ii) overlooked or did not understand the language of paragraph 4 of the March 1, 2004 letter because he "never would have agreed to" paragraph 4 of the letter which conditioned payment of any commission upon an actual closing (Dep. of Mr. Guinn at p. 54, line 8 through p. 56, line 25.) In an effort to avoid the plain provisions of these letter agreements, Mr. Guinn argued at trial that the two letters were not binding on him because they related to "separate proposals" in that (i) the January 13, 2004 letter referred to "40 acres of commercial property" and (ii) the March 1, 2004 letter referred to "approximately 995 acres". (Tr. Vol. I at p. 186, line 11 through p. 189, line 10.)

However, Mr. Guinn's "separate agreement" argument is wholly inconsistent with the weight of the evidence. Specifically, the disputed contract Mr. Guinn prepared contained a provision which stated that the "Seller agrees to pay Dorada Real Estate Services a sales commission *pursuant to its agreement with such broker*". (Pl.Ex. 27, ¶ 15; Defs.' Ex. 32, ¶ 15) (emphasis added.) When Mr. Guinn was asked at his deposition to identify which "agreement" to which paragraph 15 was referring, he said that it was a "cross-reference" to paragraph 5(a) of the disputed contract which stated that the Harrells were required to pay a real estate broker's commission of "six percent of selling price". (Dep. of Mr. Guinn at p. 58, lines 16–20).[9] The Harrells testified, however, that they did not discuss, much less agree to, any new commission agreement with Mr. Guinn during the December 21, 2004

meeting and, instead, believed that their January 13 and March 1, 2004 letters set forth the only agreements they had with Guinn regarding the payment of any sales commissions. (Tr. Vol. I at p. 54, lines 15–25.)

The evidence in this case also establishes that somehow between December 7 and December 21, 2004, without the knowledge or permission of the Harrells, paragraph 5(a) had been altered by the clause "(see addendum)" being deleted and the clause "(six percent of the selling price)" being added in the final version. Specifically, the original version of the proposed contract stated:

(a) **Seller Costs:** Seller will pay the cost of preparation of deeds, documentary stamps, deed transfer tax, the fees and expenses of its own attorney, the real estate broker's commission, (*see addendum*) and title insurance.

(Pls.' Ex. 25; Defs.' Ex. 28) (emphasis added.) Yet the final version of paragraph 5(a), which Mr. Guinn unilaterally changed, stated:

(a) **Seller Costs:** Seller will pay the cost of preparation of deeds, documentary stamps, deed transfer tax, the fees and expenses of its own attorney, the real estate broker's commission (*six percent of selling price*), and title insurance.

(Pls.' Ex. 27; Defs.' Ex. 32.) From Mr. Guinn's deposition it is unclear how the wording had been changed, as Mr. Guinn never fully explained just when or why the change occurred. (Dep. of Mr. Guinn at p. 5, lines 15 through p. 61, line 7, p. 61, line

---

**9.** Paragraph 5(a) of the disputed contract stated:

(a) **Seller Costs:** Seller will pay the cost of preparation of deeds, documentary stamps, deed transfer tax, the fees and expenses of its own attorney, the real estate broker's commission (six percent of selling price), and title insurance.

(Pls.Ex.27, ¶ 5(a); Defs.' Ex. 32, ¶ 5(a); Tr. Vol. I at p. 58, lines 16–20.)

17 through p. 63, line 2, and p. 65, line 16 through p. 66, line 7.)

### D. *Procedural posture.*

On March 28, 2005, Fla–Land, the assignee of Wood & Associates, and Dorada filed a motion for relief from stay to proceed with its breach of contract/specific performance action in state court. On May 16, 2005, the Harrells filed this adversary proceeding against Wood & Associates, Fla–Land and Dorada seeking a declaratory judgment that (i) no enforceable contract exists between the Harrells and Wood & Associates, (ii) Wood & Associates and Fla–Land have no rights that may be enforced against the Harrells with respect to the disputed contract, (iii) the Harrells do not owe Dorada a sales commission or damages in connection with the disputed contract and (iv) the Harrells do not have any obligations to any of Defendants as a result of the incomplete contract negotiations between the Harrells and Wood & Associates. The Court retained jurisdiction to hear the matter and on June 1, 2005, Fla–Land and Dorada filed their answers and counterclaims for damages and specific performance. Dorada also counterclaimed for damages based on the Harrells' alleged failure to pay a real estate commission. Wood & Associates filed its answer and counter-claim on October 19, 2005, in which it claimed specific performance or alternatively damages caused by the Harrells' alleged breach of contract. The Harrells filed their answer to Wood & Associates' counterclaim on October 26, 2005.

The deposition of Mr. Roberts was taken on January 17, 2006, and Mr. Roberts advised, for the first time, that Osceola would now exercise its right to retain the property under the terms of the contract. Wood & Associates and Fla–Land filed a Motion to Join Person Needed for Just Adjudication on February 7, 2006, along with the proposed counterclaim against Osceola. Therefore, more than one year after declaring the Harrells in breach of the disputed contract, Wood & Associates and Fla–Land filed a counterclaim for specific performance against Osceola as an involuntary party plaintiff. The Harrells stipulated to the motion and an order granting the motion was entered on February 23, 2006. The counterclaim against Osceola was filed the same day as the answer of Osceola and the amended answers and affirmative defenses by the Harrells to the counterclaims of Defendants. Trial of this cause was held on March 2 and 3, 2006.

### CONCLUSIONS OF LAW

The record in this proceeding is quite voluminous, encompassing countless factual assertions propounded by the parties as well as innumerable legal arguments. Given the expansiveness of the claims, the Court will address each issue in turn. This simple breach of contract case can be winnowed down into its most pertinent elements: 1) a valid contract was formed, but the condition precedent was not fulfilled; and 2) there was no fiduciary relationship between Mr. Guinn and the Harrells, but because Mr. Guinn breached his duties as a broker, and because the Harrells and Mr. Guinn orally modified their Listing Agreement and the contract never closed, the Harrells need not pay Mr. Guinn's commission.

### A. *A valid contract was formed, but the condition precedent was not fulfilled.*

The cornerstone of this case hinges upon the existence of a valid contract. The facts surrounding the formation of the contract are quite convoluted, yet the weight of the evidence clearly shows that while a contract was formed between the Harrells

and Wood & Associates, the condition precedent with respect to Osceola was not fulfilled. It was the intention of both parties to enter into this agreement, but the Harrells never obtained the written consent of Osceola, as required pursuant to the terms of the contract.

### i. *The Harrells received the entire contract to sign on December 21, 2004.*

 Federal Rules of Civil Procedure, Rule 30(e) permits a deponent to modify or make corrections to a deposition for form or substance. However, while older case law has taken a broader view of the rule, the modern trend, one that is bolstered by the Eleventh Circuit, is to view Rule 30(e) with a restrictive eye. The Eleventh Circuit recently broached the issue in *Amlong & Amlong, P.A. v. Denny's, Inc.,* 457 F.3d 1180 (11th Cir. 2006). The *Amlong* court surveyed case law which articulated the narrow view of Rule 30(e). For example, in quoting *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992), the Eleventh Circuit echoed that "[a] deposition is not a take home examination." *Amlong,* 457 F.3d at 1220. In further elucidating, the Eleventh Circuit continued to quote *Greenway* by reiterating that

> [t]he purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.

*Id.* (citing *Greenway,* 144 F.R.D. at 325). The Eleventh Circuit continued its analysis by stating a broader interpretation of Rule 30(e) holds "potential for abuse." *Id.* (quoting *SEC v. Parkersburg Wireless, L.L.C.,* 156 F.R.D. 529, 535 (D.D.C.1994) (citing *Greenway,* 144 F.R.D. at 325) (other citation omitted)). In addition, the *Amlong* court noted that the Eleventh Circuit itself had affirmed a district court's decision to disregard an errata sheet that attempted to contradict a deposition when the deponent claimed confusion at the deposition. *Id.* at 1221 (citing *Reynolds v. IBM, Corp.,* 320 F.Supp.2d 1290, 1301 (M.D.Fla.2004), *aff'd* 125 Fed.Appx. 982 (11th Cir.2004)).

 During the deposition of Mr. Harrell, which took over three hours, there is not a single mention that the Harrells were only presented with the signature page of the contract. (*See generally* Dep. of Mr. Harrell.) In fact, the deposition reveals the converse, that the Harrells *were* presented with the contract in its entirely. Specifically, when Mr. Harrell was asked to identify the disputed contract, he acknowledged that the document was "a clean contract [that] was presented to [him] that had no signatures on it." (*Id.* at p. 68, lines 13–14.) Additionally, counsel for Wood & Associates and Mr. Guinn requested that Mr. Harrell "turn to the signature page" (*Id.* at p. 72, line 9) of the disputed contract, again leading to the reasonable conclusion that Mr. Harrell held in his hands a multi-paged document. Furthermore, when questioned if the document reflected "an accurate copy of the contract that [he] signed that day" (*Id.* at p. 73, lines 1–2), Mr. Harrell responded that it "appear[ed]" to be." (*Id.* at p. 73, line 4.) Surely such a response would not have been appropriate if he had only received the signature page. In fact, when given the opportunity to refute his prior deposition testimony ("[I]s there anything

about this contract … that does not appear to be what was in the contract you signed that day?") (*Id.* at p. 73, lines 6–8), Mr. Harrell merely referenced the deposit discrepancy. (*Id.* at 9–10.)

When considering the disparate testimony Mr. Harrell gave about the initialing of the disputed contract and prior contracts coupled with the glaring omission of deposition testimony regarding the signature page, the Court evaluates the credibility of Mr. Harrell as dubious. The greater weight of the evidence reveals that what more likely happened on December 21, 2004, is that Mr. Guinn, after several weeks or months of negotiations, presented the Harrells with a clean contract for their perusal and signatures. As a result, the Court will disregard Mr. Harrell's errata sheets with respect to the testimony of the signature page. Taking a restrictive approach to Rule 30(e), the Court believes it is within the parameters of Eleventh Circuit precedent in disregarding the errata sheet which contradicts the deposition testimony on this issue. As a result, the Court finds that the Harrells were presented with the complete contract to sign on December 21, 2004.

### ii. *Upon signing of both parties, a binding legal agreement was forged.*

"A contract is made under Florida law when the three elements of contract formation are present: offer, acceptance, and consideration." *Pezold Air Charters v. Phoenix Corp.,* 192 F.R.D. 721, 725 (M.D.Fla.2000) (citing *Air Prods. & Chems., Inc. v. The Louisiana Land & Exploration Co.,* 806 F.2d 1524, 1529 (11th Cir.1986)). After a series of negotiations commencing between August and November 2004 involving multiple changes in the terms of the proposed contract including what properties were being sold and the

prices, the Harrells signed a proposed contract on December 21, 2004, which was presented to Wood & Associates for acceptance. All three of the Harrells had an opportunity to read the contract, ask Mr. Guinn any questions they had about the contract and make any changes in the terms. The fact that the Harrells knew what was in or not in the contract is clear by the handwritten additions at the bottom of the signature page. Material additions were made in terms of the property being sold as well as the price.

The duration of the meeting on December 21, 2004 at dispute is of no consequence. The evidence in the record reveals that the Harrells had been negotiating with Wood & Associates over the property involved with the disputed contract for many months. Therefore, even if the meeting only lasted between five to ten minutes, the Harrells had enough notice to be fully apprised of the terms contained in the contract.

During the month of December, Curt Harrell and Mr. Guinn exchanged countless counteroffers addressing multifarious issues, ranging from purchase price to deposit amount to closing dates. The disputed contract reflects the culmination of each of the counteroffers conveyed between the parties. The purchase price incorporates Curt Harrell's counteroffer of $2,500 per acre for all noncommercial acreage, and $6,500 per acre for commercial acreage. (Pls.' Ex. 25; Defs.' Ex. 31.) The deposit had been changed to $20,000, and the closing date was moved to 75 days from the Effective Date. (*Id.*) The disputed contract also has five written additions at the bottom of the signature page, including a reduction in the purchase price of certain parcels to $1,500 per acre and incorporating Osceola's acceptance as the Effective Date. (*Id.*) Mr. Harrell, Curt Harrell and Matt Harrell all signed and dated this

page and each initialed the five additions. (*Id.*) Thus, it is quite clear to the Court that the Harrells intended for their offer to be binding on Wood & Associates, upon its acceptance. Although the Harrells claim that they never agreed to a $20,000 deposit, it appears from the record that this was a compromise between the parties between $5,000 and $50,000. If the Harrells did not want their property to be taken off the market for $20,000, then all three of them should not have signed the contract.

In addition, Mr. Harrell testified during his deposition that his professional background, for most of his career, was as a mortgage banker, and that he owned his own mortgage company. Furthermore, Mr. Harrell claimed a lot of experience dealing with contracts in general and specifically, real estate contracts. Given his extensive experience, the Court is hard-pressed to find that Mr. Harrell signed a complete contract with his two sons after months of negotiations without the intent of entering into a binding agreement.

Lastly, all three Harrells uniformly testified at trial that they routinely relied upon advice of counsel prior to signing any document that was to become a final, binding agreement. And this instance was no exception: Mr. Harrell, in his deposition, confirmed the participation of counsel in the formation of this contract. Due to the experience of the parties, the prolongation of the negotiations, and all of the evidence in the record, the Court finds that as of December 21, 2004, the Harrells intended to enter into a binding legal agreement with Wood & Associates. As a result, in accordance with Florida law, the Harrells presented Wood & Associates with their offer on December 21, 2004.

After the contract was presented to Wood & Associates, Mr. Wood signed the contract on December 27, 2004, within the time frame set forth in the contract for execution by the buyer. All of the essential terms of a real estate contract were contained in the contract, which was agreed to by all parties. At this time, Wood & Associates accepted the Harrells' offer for valid consideration, thereby effectively forming a contract pursuant to Florida law. At that point, the parties had executed a valid and binding contract, subject only to compliance with the stated condition precedent of Osceola approving the contract.

### iii. The condition precedent pertaining to Osceola was not fulfilled.

■ The proposed contract expressly provided that it was "expressly contingent upon the approval of Osceola ...." (Pls.' Ex. 25; Defs.' Ex. 31.) This provision constituted a condition precedent, which made Osceola's approval a prerequisite to the existence of the contract. In this case, because Osceola never gave its written approval, a contract was not formed.

■ Under Florida law, if a contract contains a condition precedent, obligations under the contract do not mature until after the condition precedent has occurred. *See, e.g., Southern Internet Sys., Inc. v. Pritula,* 856 So.2d 1125, 1128 (Fla. 4th Dist.Ct.App.2003); *Carson v. Fishtail Marine of Naples, Inc.,* 697 So.2d 1222, 1223–24 (Fla.2d Dist.Ct.App.1997).

The condition precedent has been defined as one which calls for the performance of some act, or the happening of some event after a contract is entered into, upon the performance or happening of which its obligation to perform is made to depend.

It is an elementary rule that there must be at least a substantial performance of conditions precedent in order to

authorize a recovery as for performance of a contract. . . .

*Cohen v. Rothman,* 127 So.2d 143, 147 (Fla. 3rd Dist.Ct.App.1961) (internal citations and quotations omitted). Approval of an agreement by a third party constitutes a condition precedent. *See Southern Internet Sys.,* 856 So.2d at 1128. Where provisions of a contract require approval of that contract by a third party, the obligations under such contract do not mature until after the approval has been given and no contract is fully formed. *Id.*

In *Southern Internet Sys.,* the plaintiff and a representative of the defendant company entered into a settlement agreement that required approval by the board of directors of the defendant company and the board of an affiliate. *Id.* at 1126. The defendants' representative never submitted the settlement agreement for approval to either board of directors. *Id.* at 1127. Rejecting the plaintiff's argument that the defendants "waived" the condition precedent by failing to submit the settlement to either board of directors, the Fourth District Court of Appeals explained:

> Here, the settlement agreement was conditioned upon approval of the board[s] of directors. . . . Neither board ever approved of the settlement agreement's terms. Therefore, the condition precedent to the formation of a contract

was never met. Hence, no contract was ever fully formed.

*Id.* at 1128; *see also Carson,* 697 So.2d 1222, 1223–24 (contract for sale of boat that required Coast Guard's inspection approval for commercial use never became binding because Coast Guard never inspected boat to approve for commercial use).

In this instance, the disputed contract expressly stated that the contract would not become effective until Wood & Associates received "written notice, by U.S. Mail or hand delivery, of approval of contract by Osceola Land and Timber Corp." (Pls.' Ex. 25; Defs.' Ex. 31.) Such approval had to be given "no later than 14 days from the Contract Date." (*Id.*) It is undisputed that Osceola never delivered written notice of its approval of the contract to Wood & Associates by "U.S. Mail or hand delivery." (*Id.*)

 Mr. Putnal transmitted the contract via facsimile to Osceola along with a letter requesting Mr. Roberts to review the contract and to notify him as to whether Osceola would purchase the property itself pursuant to the terms of the Option Agreement. Upon review, Mr. Roberts determined that Osceola would not elect to retain the property. Mr. Roberts then penciled in revisions on the contract that were forwarded to Mr. McDavid, who then conferred with Mr. Putnal.[10] Mr. Putnal

10. In fact, according to contract law, when Mr. Roberts added his hand-written suggestions to the contract, he, in effect, created a counteroffer and submitted it to both the Harrells and Wood & Associates for their review and acceptance. In order to form a valid contract, actual assent by the parties upon exactly the same matters is indispensable. *Strong & Trowbridge Co. v. H. Baars & Co.,* 60 Fla. 253, 54 So. 92, 93 (1910) (citations omitted); *Webster Lumber Co. v. Lincoln,* 94 Fla. 1097, 115 So. 498, 502 (1927) (citations omitted); *McCay v. Seaver,* 98 Fla. 710, 124 So. 44 (1929) (quoting *Webster Lumber*); *Prescott v. Mut. Benefit Health & Accident Ass'n,* 133 Fla. 510, 183 So. 311, 314 (1938) (quoting *Webster Lumber*); *Gen. Fin. Corp. of Jacksonville v. Stratton,* 156 So.2d 664, 666–67 (Fla. 1st Dist. Ct.App.1963) (quoting *Webster Lumber*). Accordingly, "there must be a meeting of the minds on all essential terms and obligations" for a contract to be binding. *Browning v. Peyton,* 918 F.2d 1516, 1521 (11th Cir.1990). The parties must assent to the same thing at the same time. *Strong & Trowbridge,* 54 So. at 93 (citations omitted); *Webster Lumber,* 115 So. at 502 (citations omitted); *Prescott,* 183 So. at 314.

sent a letter on January 7, 2005, to Mr. McDavid confirming the revisions. In this letter, Mr. Putnal acknowledged Osceola's revisions and in closing, stated that once he made the appropriate revisions to the contract as proposed by Osceola, that he would then seek Osceola's written consent to the sale. Furthermore, Mr. Roberts testified that he and his company were never given the opportunity to approve the finalized contract and mail or hand deliver Osceola's approval of the sale back to Mr. Putnal.

■ The clear and unambiguous language of a contract controls what specific actions fulfill the condition precedent:

The parties selected the language of the contract. Finding it to be clear and unambiguous, we [Florida Supreme Court] have no right—nor did the lower court—to give it a meaning other than that expressed in it. To hold otherwise would be to do violence to the most fundamental principle of contracts.

*Hamilton Const. Co. v. Bd. of Pub. Instruction of Dade County*, 65 So.2d 729, 731 (Fla.1953) (citation omitted); *see also Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.*, 609 So.2d 66, 68 (Fla. 4th Dist.Ct.App.1992) ("Where contracts are clear and unambiguous, they should be construed as written, and the court can give it no other meaning.") (citing *Hamilton Const.*, 65 So.2d at 731).

■ Wood & Associates signed the contract, thereby agreeing to all terms therein. Thus, Wood & Associates specifically agreed that Osceola would give its written approval via U.S. mail or hand delivery. The Harrells never waived[11]

"Florida employs the 'mirror image rule' with respect to contracts. Under this rule, in order for a contract to be formed, an acceptance of an offer must be absolute, unconditional and identical with the terms of the offer." *Montgomery v. English*, 902 So.2d 836, 837 (Fla. 5th Dist.Ct.App.2005) (citations omitted). In the instant case, Mr. Roberts penciled in revisions on the contract that were forwarded to Mr. McDavid, which were eventually sent to Mr. Putnal, then forwarded on to Wood & Associates. These revisions were accepted by Wood & Associates, as demonstrated by Mr. Wood's initials, but the revised contract was never presented to the Harrells for their acceptance.

Because Osceola, an interested third-party to the contract, made revisions to the contract signed by the Harrells and Wood & Associates, such modification caused the contract to become a counteroffer from Osceola to both parties for their acceptance. *See, e.g., Strong & Trowbridge*, 54 So. at 93–94 ("If a person offers to do a definite thing, and the person to whom the offer is made ... introduces a new term into the acceptance, his answer is not an acceptance; but it is either a mere expression of willingness to that, or it is in effect a counter offer, which must be accepted or assented to before a contract can result."); *see also Jacksonville Port Auth. v. W.R. Johnson Enters.*, 624 So.2d 313, 314 (Fla. 1st Dist.Ct.

App.1993) ("So long as any essential matters remain open for further consideration, there is no completed contract. In order to create a contract it is essential that there be reciprocal assent to a certain and definite proposition.") (quoting *Mann v. Thompson*, 100 So.2d 634, 637 (Fla. 1st Dist.Ct.App.1958)).

All three parties did not assent to exactly the same matters in this case. Per the "mirror-image" rule, Osceola's revisions to the contract constituted a counteroffer to both Wood & Associates and the Harrells. Because the Harrells never had the opportunity to accept Osceola's counteroffer, there was no "meeting of the minds" as to all essential terms and obligations of the contract. As a matter of law, therefore, the proposed contract never became binding on the Harrells once Osceola submitted its counteroffer.

11. "Under certain circumstances, written contracts may be modified by a course of dealings, or by the parties' subsequent oral agreement." *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1096 (Fla. 1st Dist.Ct.App. 1999) (citing *Linear Corp. v. Standard Hardware Co.*, 423 So.2d 966, 968 (Fla. 1st Dist.Ct. App.1982) and *Barile Excavating & Pipeline Co., Inc. v. Vacuum Under Drain, Inc.*, 362 So.2d 117, 119 (Fla. 1st DCA 1978)) (additional citations omitted). However,

this specific requirement, as Mr. Putnal acknowledged that he anticipated Osceola's written consent. Furthermore, there is no evidence that Osceola ever finally agreed to not retain the property, besides Mr. Roberts' initial decision to forego Osceola's right to repurchase the property.

 The condition precedent was never fulfilled,[12] and although it was the Harrells' and Wood & Associates' intent to enter into a binding agreement, the contract lapsed and failed to ripen into a legal agreement with mutual obligations on both parties. Ergo, the Court cannot find a contract between the parties, and as a result, the Harrells were not in breach [13] of any agreement when they requested an extension of time to close the deal. Therefore, the Harrells are not liable to either Wood & Associates [14] or Fla–Land for

[w]hen a course of dealing and the terms of the contract appear to conflict, the parties' practice and the written agreement must be construed as consistent with each other, if it is reasonable to do so. If no reasonable consistent construction can be drawn, however, the express terms of the agreement control.

*Id.* (citing *Linear Corp.*, 423 So.2d at 968 and *Barile Excavating*, 362 So.2d at 119) (additional citations omitted).

As evinced by the facts of the case, the course of dealing between the parties does not conflict with the express terms of the contract. The Court finds that the January 11, 2005 letter which Mr. Putnal sent to Wood & Associates' attorneys does not satisfy the express requirements of the contract of Osceola's written notice of approval by U.S. mail or hand delivery. Mr. Putnal insisted on adhering to the specific language of the contract. Because of this insistence, the Harrells did not waive adherence to the terms of the contract.

12. It is inapposite to suggest that Osceola substantially complied with the condition precedent. Some courts have found substantial compliance with a condition precedent to fulfill the condition. *See, e.g., Seaside Cmty. Dev. Corp. v. Edwards*, 573 So.2d 142, 145–46 (Fla. 1st Dist.Ct.App.1991) (finding repeated attempts of buyer to meet with seller to formalize a design for the final structure of a house when the contract did not explicitly state the terms of design agreement constituted substantial performance of the condition precedent). But the facts of the instant case differ immensely than those courts which have found substantial performance. To wit, the contract in the instant proceeding specifically called for written approval via either U.S. mail or hand delivery. In addition, although Osceola initially decided not to repurchase the property, there is no evidence before the Court to suggest that Osceola would not have changed its mind when presented with the finalized contract. Lastly, the condition precedent was based upon the action of an interested third-party and not one of the parties to the contract itself. As a result, neither the Harrells nor Wood & Associates had an obligation to convince Osceola to approve the final contract or seek its approval, so the absence of such action on the part of either party cannot be factored into the Court's consideration of whether Osceola substantially complied.

13. There is no evidence before the Court that upon the opportunity of giving its final, written approval of the contract that Osceola would not have then decided to keep the property itself.

14. It is debatable that Wood & Associates would have even had a claim against the Harrells. On March 24, 2005, Wood & Associates assigned the disputed contract to Fla–Land. Mr. Wood admitted at trial that Wood & Associates had no interest in the disputed contract nor had any claim against Osceola:

Q [Mr. Post] Now, your company, Wood & Associates, has filed a counter claim in this case for breach of contract and specific performance against the Harrells and Osceola Land & Timber, but Wood & Associates has no financial stake or potential risk of loss pending those litigations, correct?
A [Mr. Wood] No, sir.

. . . .

Q [Mr. Decker, attorney for Osceola] The corporation [Wood & Associates] does not have any claim against Osceola, does it?
A [Mr. Wood] No, sir.
Q And there is no contractual relationship between Wood & Associates of Amer-

breach of contract, as no contract existed for the Harrells to breach.

**B.** ***There was no fiduciary relationship between Mr. Guinn and the Harrells, but because Mr. Guinn breached his duties as a broker, and because the Harrells and Mr. Guinn orally modified their Listing Agreement and the contract never closed, the Harrells need not pay Mr. Guinn's commission.***

■ According to Florida law, Florida Statutes, Section 472.272 states that "[d]isclosed dual agency as an authorized form of representation by a real estate licensee in this state is expressly revoked". FLA. STAT., Section 472.272(1) (2003). Florida defines a "broker" as a person who, among other things, is someone who

for another, and for a compensation or valuable consideration directly or indirectly paid or promised, expressly or impliedly, . . . sells, exchanges, buys, . . . or offers, attempts or agrees to . . . negotiate the sale, exchange, [or] purchase, . . . of . . . any real property . . . , or who directs or assists in the procuring of prospects or in the negotiation or closing of any transaction which does, or is calculated to, result in a sale, . . . and who receives, expects, or is promised any compensation or valuable consideration, directly or indirectly therefor . . . .

FLA. STAT., Section 475.01(1)(a) (2003). Furthermore, the "Brokerage Relationship Disclosure Act", *see* FLA. STAT., Section 475.2701 (2003), allows for "no brokerage relationship[s]". FLA. STAT., Section 475.278(4) (2003). However, although a brokerage relationship does not exist, a real estate licensee still owes to the seller or buyer three duties: (1) to deal honestly

---

ica, Inc. and Osceola Land & Timber Corporation, is there?

A No, sir.

(Tr. Vol. II at p. 14, line 24 through p. 15, line 4, and p. 15, line 21 through p. 16, line 2.) At the time the disputed contract was assigned by Wood & Associates, Fla–Land knew that the enforceability of the contract was in dispute. Mr. Lawson testified that Fla–Land took an assignment of the alleged contract without paying any consideration but with knowledge that there would be litigation involving the matter:

Q [Mr. Post] At the time of this—this assignment was made on March 24, 2005, did you know that there was potential litigation regarding this contract?

A [Mr. Lawson] Yes, sir.

. . . .

Q And notwithstanding that knowledge, you caused this assignment to be made, correct?

A Yes, sir.

. . . .

Q [Mr. Decker] Prior to the time that you took that assignment on March 24th, you had already made the decision to commence litigation on this matter; isn't that correct?

A [Mr. Lawson] Yes, sir.

(Tr. Vol. II at p. 54, lines 1–4 and lines 17–19, and p. 63, lines 9–12.)

"It is well-established that an unqualified assignment transfers to the assignee all the interests and rights of the assignor in and to the thing assigned." *State v. Family Bank of Hallandale,* 667 So.2d 257, 259 (Fla. 1st Dist. Ct.App.1995); *see also Lawyers Title Ins. Co., Inc. v. Novastar Mortgage, Inc.,* 862 So.2d 793, 798 (Fla. 4th Dist.Ct.App.2003) (citation omitted); *Rose v. Teitler,* 736 So.2d 122 (Fla. 4th Dist.Ct.App.1999) (quoting *Family Bank,* 667 So.2d at 259); *Dove v. McCormick,* 698 So.2d 585, 589 (Fla. 5th Dist.Ct.App.1997) (quoting *Family Bank,* 667 So.2d at 259). Pursuant to Florida law, when a party assigns a contract, the party assigns all equitable and legal interest in the contract to the assignee. *See, e.g., Dept. of Rev. v. Bank of America, N.A.,* 752 So.2d 637, 642 (Fla. 1st Dist.Ct.App. 2000). The assignee stands in the shoes of the assignor and the assignor does not retain any legal or equitable rights in the thing assigned. *Id.; see also Cadle Co. II, Inc. v. Stamm,* 633 So.2d 45, 46 (Fla. 1st Dist.Ct. App.1994). Accordingly, Wood & Associates would have had no standing to bring this action for specific performance against Osceola.

and fairly, (2) to disclose all known facts that materially affect the value of residential property that are not readily available to the buyer, and (3) to account for all funds entrusted to the licensee. *Id.* at (4)(a). According to the statute, to fairly apprise the buyer or seller that no brokerage relationship exists, Florida law requires the following wording:

IMPORTANT NOTICE

FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES PROVIDE THIS NOTICE TO POTENTIAL SELLERS AND BUYERS OF REAL ESTATE.

You should not assume that any real estate broker or salesperson represents you unless you agree to engage a real estate licensee in an authorized brokerage relationship, either as a single agent or as a transaction broker. You are advised not to disclose any information you want to be held in confidence until you decide on representation.

NO BROKERAGE RELATIONSHIP
NOTICE

FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES WHO HAVE NO BROKERAGE RELATIONSHIP WITH A POTENTIAL SELLER OR BUYER DISCLOSE THEIR DUTIES TO SELLERS AND BUYERS.

*Id.* at (4)(c).

Florida jurisprudence further dictates that the "relationship of broker-to-client is a professional one, requiring the avoidance of a conflict of interest, and when it occurs, full disclosure and the sacrifice of self-interest." *Ehringer v. Brook-field & Assocs., Inc.,* 415 So.2d 774, 776 (Fla. 5th Dist.Ct.App.1982). More importantly, "[b]efore the execution of a brokerage agreement there must be a full, fair, and open disclosure by the broker or its agents to the prospective client of all material matters." *Id.* "A material matter is any matter which would reasonably or likely affect or influence the conduct of a reasonable person in entering or declining to enter into the proposed brokerage agreement." *Id.* at 776 n. 4.

Accordingly, Mr. Guinn did not owe a fiduciary duty to the Harrells. This, however, does not mean that he owed them no duty at all. The Court finds that Mr. Guinn breached his duty to deal honestly and fairly as a broker to the Harrells. By only contacting one person, Mr. Lawson, whom Mr. Guinn had known for at least seventeen years, Mr. Guinn engaged in a conflict of interest for which he did not provide full disclosure. Furthermore, the Harrells stated that they were unaware that Mr. Guinn never listed any portion of the Harrells' 764 Acres Purchase property with the Multiple Listing Service or any other such service, or that Mr. Guinn never advertised any portion of the property for sale until after the 764 Acre Purchase had been closed. These were material expectations that the Harrells presumed Mr. Guinn would fulfill as part of his duties as a broker.[15] Both of these acts were a breach of Mr. Guinn's duty to deal honestly and fairly with the Harrells.

In addition, the Court finds that Mr. Guinn did not fully disclose all that he was required to disclose according to Florida law when entering into this relationship with the Harrells. First, the FAR/BAR Listing Agreement does not contain the

---

**15.** Mr. Harrell stated in testimony that he "expect[ed] Mr. Guinn to have the property listed on MLS [Multiple Listing Service] .... [o]r some comparable listing." (Tr. Vol. II at p. 114, lines 16–18.)

express wording designated by Florida Statute. (*See* Defs.' Ex. 2.) Also, Mr. Guinn never informed the Harrells that "he did not represent [the Harrells] as a broker either before or after [the Harrells] signed the exclusive listing agreement." (Tr. Vol. II at p. 114, lines 6–9.) These two facts alone are in violation of Florida's Brokerage Relationship Disclosure Act.

Yet Mr. Guinn went further in breaching his duties to deal honestly and fairly with the Harrells. During their relationship with Mr. Guinn, the Harrells shared with him confidential information regarding their financial situation, their Chapter 11 cases and the property itself, including the Harrells' opinions regarding property values, strategy for sale and concerns regarding the marketing of the property. Because the Listing Agreement did not have the wording expressly designated by Florida law, the Harrells were unaware that they should not have shared this confidential information with him. At no point did Mr. Guinn ever attempt to keep the Harrells from sharing such information over the course of the Harrells' two-year relationship with Mr. Guinn.

The evidence in this case also establishes that at some point between December 7 and December 21, 2005, without the knowledge or permission of the Harrells, specific wording was altered in the disputed contract. Specifically, paragraph 5(a) was changed by deleting the clause "(see addendum)" and adding the clause "(six percent of the selling price)" in the final version. The original version of the proposed contract stated:

(a) **Seller Costs:** Seller will pay the cost of preparation of deeds, documentary stamps, deed transfer tax, the fees and expenses of its own attorney, the real estate broker's commission, (*see addendum*) and title insurance.

(Pls.' Ex. 25; Defs.' Ex. 28) (emphasis added.) Yet the final version of paragraph 5(a), which Mr. Guinn unilaterally changed, stated:

(a) **Seller Costs:** Seller will pay the cost of preparation of deeds, documentary stamps, deed transfer tax, the fees and expenses of its own attorney, the real estate broker's commission (*six percent of selling price*), and title insurance.

(Pls.' Ex. 27; Defs.' Ex. 32.) From Mr. Guinn's deposition it is unclear how the wording had been changed, as Mr. Guinn never fully explained just when or why the change occurred.

The Court does not find Mr. Guinn's testimony throughout the course of the trial with respect to his relationship with the Harrells to be credible. His demeanor was belligerent and evasive, and it was merely by the sheer weight of the evidence that the Court even found that a contract had been formed, as it appeared to the Court that Mr. Guinn could not be accredited. The Court finds that at some point Mr. Guinn altered the contract with the intent and purpose of obtaining a binding agreement from the Harrells to pay a commission even if the contract did not close. This is further evidence of self-dealing and an even more egregious breach of Mr. Guinn's duties to deal honestly and fairly with the Harrells. Therefore, simply based on these statutory violations alone Mr. Guinn is not entitled to a commission.

However, the evidence would support that Mr. Guinn was not entitled to a commission, even aside from his violations of the statute. "Under certain circumstances, written contracts may be modified by a course of dealings, or by the parties' subsequent oral agreement." *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1096 (Fla. 1st Dist.Ct.App.1999) (citing *Linear Corp. v. Standard Hardware Co.*,

423 So.2d 966, 968 (Fla. 1st Dist.Ct.App. 1982) and *Barile Excavating & Pipeline Co., Inc. v. Vacuum Under Drain, Inc.*, 362 So.2d 117, 119 (Fla. 1st Dist.Ct.App. 1978)) (additional citations omitted). The party alleging that the written contract has been modified by an oral agreement bears the burden of proving such modification occurred. *Newkirk Constr. Co. v. Gulf County*, 366 So.2d 813, 815 (Fla. 1st Dist.Ct.App.1979) (citation omitted). The party also must show that new consideration as well as consent of both parties supports such a modification. *Id.*

 Following the 764 Acre Purchase, Mr. Guinn advised the Harrells that he wanted to bring offers to the Harrells for the purchase of more of the property but that he needed a letter from the Harrells which "protected" him in regard to the payment of any prospective real estate commission. The Harrells agreed by letters dated January 13, 2004 and March 1, 2004, to pay Mr. Guinn a real estate commission if a sale was closed on any contract procured by Mr. Guinn. The Court finds that the Harrells satisfied their burden, as these letters are sufficient evidence to show that the Listing Agreement was modified by oral agreement of the Harrells and Mr. Guinn.[16] First, the letters clearly establish the consent of both parties in-

---

**16.** The January 13, 2004 letter reads as follows:

> Dear Steve [Mr. Guinn]:
>
> This will confirm our telephone conversation today in which we discussed the following:
>
> 1. We understand that you may submit to the Harrells a bid on behalf of a group interested in purchasing 40 acres of commercial property owned by the Harrells (which is subject to your existing listing agreement with the Harrells), together with some non-commercial property (which is not included in your listing agreement).
>
> 2. The Harrells hereby agree that, if you submit such a bid and it results in a sale of all or any portion of such property upon terms acceptable to the Harrells, you will be paid a broker's fee from such sale in an amount equivalent to the fee schedule set forth in your existing listing agreement.
>
> 3. This agreement should not be construed as an agreement by the Harrells to list with you any additional property owned by the Harrells other than the property which is subject to your existing listing agreement dated March 4, 2003.
>
> 4. Nothing herein shall obligate the Harrells to sell any property or pay any broker fee unless and until the Harrells execute and close on a contract procured by you to sell all of any portion of the property referred to in paragraph 1 above.
>
> Please call me if you have any questions regarding the foregoing.
>
> Very truly yours,
> James H. Post

(Pls.' Ex. 18.)

The March 1, 2004 letters reads as follows:

> Dear Steve [Mr. Guinn]:
>
> This will confirm our telephone conversation today in which we discussed the following:
>
> 1. We understand that you may submit to the Harrells a bid on behalf of a group interested in purchasing approximately 995 acres of property owned by the Harrells including property which is not included in your existing listing agreement.
>
> 2. The Harrells hereby agree that, if you submit such a bid and it results in a sale of all or any portion of such property upon terms acceptable to the Harrells, you will be paid a broker's fee from such sale in an amount equivalent to the fee schedule set forth in your existing listing agreement. Such payment shall be made on the date of closing, if any, of the sale of the property referred to in paragraph 1 above.
>
> 3. This agreement should not be construed as an agreement by the Harrells to list with you any additional property owned by the Harrells other than the property which is subject to your existing listing agreement dated March 4, 2003.
>
> 4. Nothing herein shall obligate the Harrells to sell any property or pay any broker fee unless and until the Harrells execute and close on a contract procured by you to sell all of any portion of the property referred to in paragraph 1 above.
>
> Please call me if you have any questions regarding the foregoing.
>
> Very truly yours,
> James H. Post

(Pls.' Ex. 20.)

volved. The letters state that they are memorializing the oral agreement that the Harrells had come to with Mr. Guinn. Had Mr. Guinn not consented to such a memorialization, he should have contacted Mr. Post and corrected any misrepresentations of the agreement. Mr. Guinn stated that although he did remember asking Mr. Post for the two letters "protecting" his prospective commission, he (i) did not receive the January 13, 2004 letter and (ii) overlooked or did not understand the language of paragraph 4 of the March 1, 2004 letter because he "never would have agreed to" paragraph 4 of the letter which conditioned payment of any commission upon an actual closing. The Court does not find Mr. Guinn's testimony to be credible. If Mr. Guinn never received the January 13, 2004 letter, then surely he would have requested another one from Mr. Post, as it was by his insistence that the letters were to be procured in the first instance. Additionally, it is improbable that Mr. Guinn would have importuned the Harrells for a letter protecting his commission, yet have overlooked the only paragraph in question that actually dealt with such payment. Thus, the Court finds that the letters exhibit consent on the part of both the Harrells and Mr. Guinn to modify the Listing Agreement.

The letters also support an oral modification in that there is new consideration. First, the Harrells were permitting Mr. Guinn to attempt to sell property that was not originally included in the Listing Agreement. In exchange, the Harrells would pay Mr. Guinn additional commission based upon the sale of such additional property. Thus, the Court finds new consideration: Mr. Guinn would have the right to sell more of the Harrells' property not originally in the Listing Agreement for an additional commission, and the Harrells would pay Mr. Guinn for procuring such a sale from above and beyond what he was obligated to do under the Listing Agreement. Therefore, the Harrells and Mr. Guinn entered into an oral modification of the Listing Agreement, which conditioned payment to Mr. Guinn only upon the closing of any contract procured by him. Because the disputed contract was never closed on, the Harrells do not owe Mr. Guinn any commission.

## CONCLUSION

While a valid contract was formed, the condition precedent was not fulfilled. It was the intention of both the Harrells and Wood & Associates to enter into an agreement to sell the disputed property. However, the condition precedent requiring the written approval of Osceola of the disputed contract was never obtained. As a result, the contract never ripened into existence. Mr. Guinn had no fiduciary duty to the Harrells, but Mr. Guinn breached his duty as a broker to deal honestly and fairly with the Harrells. In addition, the Harrells and Mr. Guinn orally modified their Listing Agreement, which conditioned payment of Mr. Guinn's commission on the closing of the contract. Because the contract never closed, the Harrells need not pay Mr. Guinn's commission. A judgment in accordance with these findings of fact and conclusions of law will be separately entered.

## JUDGMENT

This proceeding came before the Court upon the Complaint for declaratory relief filed by Plaintiffs, C.W.R. Harrell, Curtis R. Harrell and Matthew W. Harrell (collectively, the "Harrells"), the counterclaim filed by Defendants, Wood & Associates of America, Inc. ("Wood & Associates") and

Fla–Land, L.L.C. ("Fla–Land"), for specific performance or alternatively damages caused by the Harrells' alleged breach of contract, the counterclaim filed by Defendant Dorada Real Estate Services ("Dorada") for damages based on the Harrells' alleged failure to pay a real estate commission, and the counterclaim filed by Defendants, Wood & Associates and Fla–Land for specific performance joining Osceola Land & Timber Corp. ("Osceola") as an involuntary party plaintiff and as an indispensable party holding title to the real estate in question under an Option Agreement with the Harrells. The trial of this proceeding was held on March 2 and March 3, 2006. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Based upon findings of fact and conclusions of law separately entered, it is

ADJUDGED:

1. No enforceable contract exists between Plaintiffs, the Harrells, and Defendants, Wood & Associates and Fla–Land, for the purchase and sale of the approximately 500 acres in dispute. Judgment is entered denying Defendants' prayer for specific performance against the Harrells and the involuntary plaintiff, Osceola.

2. The Notice of Lis Pendens filed and recorded in Official Record Book 1200, Pages 401 through 410, Public Records of Suwannee County, Florida, on June 1, 2005, by Defendants, Wood & Associates and Fla–Land, in connection with their counterclaim for specific performance is canceled and discharged.

3. Judgment is entered in favor of Plaintiffs, the Harrells, and involuntary plaintiff, Osceola, and against Defendants, Wood & Associates, Fla–Land and Dorada, as to the complaint and each counterclaim filed herein.

4. Defendants, Wood & Associates, Fla–Land and Dorada, shall take nothing on their counterclaims against Plaintiffs, the Harrells, and the involuntary plaintiff, Osceola, and the counterclaims are dismissed on their merits.

5. Defendant Dorada shall take nothing on its counterclaim for a real estate commission against Plaintiffs, the Harrells, and the counterclaim is dismissed on the merits.